**AMERICAN STATES INSURANCE COMPANY, Appellee,**

v.

**GUILLERMIN et al.; Kimberly et al., Appellants.**

[Cite as *Am. States Ins. Co. v. Guillermin* (1996), 108 Ohio App.3d 547.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 15259.

Decided Jan. 17, 1996.

548

*Thomas E. Jenks,* and *W. Benjamin Hood,* for appellee.

*Bruce S. Wallace,* for the Guillermins.

*Carl W. Zugelter* and *Ronald W. Springman, Jr.,* for appellants, the Kimber-lys.

BROGAN, Presiding Judge.

Appellants, Lee John Kimberly, a minor by and through his father and next friend Ronald Kimberly, Sr., Virginia Kimberly, Ronald Kimberly, Jr., a minor by and through his father and next friend Ronald Kimberly, Sr., and Ronald Kimberly, Sr., appeal from a grant of summary judgment by the Montgomery County Court of Common Pleas in favor of American States Insurance Company ("American States"), appellee herein. The trial court awarded summary judgment upon American States' action for declaratory relief, in which the company claimed it was not bound under the terms of its homeowner's policy to extend

coverage or a defense to its insured, Alverda Guillermin ("Alverda"), defendant below.

American States issued a homeowner's policy to Alverda which was effective from December 20, 1992 to December 20, 1993. The policy insured Alverda's residence, located at 320 Ashwood in Dayton (the "insured location"). Alverda also owns a fifty-two-acre farm in Brown County, Ohio. The policy did not include the farm within its coverage terms. Although Alverda did not reside on the farm and only visited there intermittently, she permitted her sons, Jerry Guillermin ("Jerry") and Ronald Guillermin ("Ronald"), defendants below, access to the farm. The sons testified that they kept horses and other animals on the farm.

On August 8, 1993, Lee John Kimberly allegedly was attacked and mauled while on property occupied by the Kimberlys by a lion that the appellants claim escaped from Alverda's farm. The Kimberlys filed suit against the Guillermins on September 16, 1993, alleging that, with Alverda's permission and Ronald's assistance, Jerry harbored the animal on the farm. The Kimberlys charged that the Guillermins were negligent for allowing the lion "to remain unattended on the premises without sufficient precautions to prevent [it] from leaving the premises." The Guillermins sought coverage and legal defense under the terms of Alverda's homeowner's policy.

On April 12, 1994, American States sought declaratory judgment in the Montgomery County Court of Common Pleas. The company alleged that it was not obligated to provide either coverage or defense for the Guillermins under the terms of the policy. American States asserted two theories: (1) that Jerry and Ronald were not "insureds"; and (2) that Alverda's farm was not an "insured location." Following discovery, American States and the Kimberlys filed motions for summary judgment and their respective memoranda in opposition to the motions. In addition to their assertion that Jerry and Ronald were "insureds," the Kimberlys also claimed that the policy should cover Alverda's allegedly tortious act of harboring the lion on her property. The trial court determined that neither son was an "insured" under the policy and that the farm was not an "insured location." The court did not address the Kimberlys' claim of coverage based on Alverda's purported harboring of the animal. The court granted American States' motion for summary judgment and denied the Kimberlys' summary judgment motion. From that judgment, the Kimberlys appeal. The Guillermins did not take an appeal from the judgment.

We consolidate the appellants' two assignments of error for our analysis.

"I. The trial court erred as a matter of law in granting American States' motion for summary judgment.

"II. The trial court erred as a matter of law in denying appellants['] (the Kimberlys['] ) motion for summary judgment."

The Kimberlys present two issues for our disposition. First, they argue that Jerry is a resident of his mother's household and, therefore, is an "insured" under the policy. The Kimberlys do not argue on appeal that Ronald is an "insured." Next, they claim the policy should extend coverage to Alverda's allegedly tortious acts. Arising necessarily from their second issue is their argument that the policy exclusion to payment for personal liability or medical treatment for " 'bodily injury' * * * arising out of a premises * * * owned by an 'insured' * * * that is not an 'insured location' " is inapplicable under the facts of this case. The appellants do not challenge the trial court's finding that the farm is not an "insured location."

Before a court may grant summary judgment, the successful party must satisfy a three-pronged test:

"The appositeness of rendering a summary judgment hinges upon the tripartite demonstration: (1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor." *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 66, 8 O.O.3d 73, 74, 375 N.E.2d 46, 47. See, also, Civ.R. 56(C).

Because it avoids a trial, summary judgment circumvents the normal litigation process. Therefore, "the burden is strictly upon the moving party to establish, through the evidentiary material permitted by the rule, that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law." *AAAA Ent., Inc. v. River Place Community Urban Redev. Corp.* (1990), 50 Ohio St.3d 157, 161, 553 N.E.2d 597, 601.

Once the movant meets its burden, the nonmoving party may not simply rely on the mere allegations of its pleadings to survive a motion for summary judgment, but must set forth specific facts showing there exists a genuine issue for determination at trial. *Savransky v. Cleveland* (1983), 4 Ohio St.3d 118, 119, 4 OBR 364, 365, 447 N.E.2d 98, 99. Moreover, the nonmoving party must produce evidence on any issue for which it bears the burden of production at trial. *Wing v. Anchor Media, Ltd. of Texas* (1991), 59 Ohio St.3d 108, 570 N.E.2d 1095, paragraph three of the syllabus; *Brads v. First Baptist Church of Germantown, Ohio* (1993), 89 Ohio App.3d 328, 333, 624 N.E.2d 737, 741, jurisdictional motion overruled (1993), 67 Ohio St.3d 1506, 622 N.E.2d 654. Courts have interpreted *Wing* to mean that the nonmovant must produce evidence on "any issue upon

which the movant meets its initial burden." *Stewart v. B.F. Goodrich Co.* (1993), 89 Ohio App.3d 35, 41, 623 N.E.2d 591, 595, jurisdictional motion overruled (1993), 67 Ohio St.3d 1489, 621 N.E.2d 410. See *Few v. Cobblestone, Inc.* (Oct. 17, 1991), Montgomery App. No. 12490, unreported, 1991 WL 216413.

■ Because a trial court's determination of summary judgment concerns a question of law, we apply the same standard as the trial court in our review of its disposition of the motion; in other words, our review is *de novo*. *Children's Med. Ctr. v. Ward* (1993), 87 Ohio App.3d 504, 508, 622 N.E.2d 692, 695, jurisdictional motion overruled (1993), 67 Ohio St.3d 1481, 620 N.E.2d 854. We "accept the evidence properly before [us] and, with respect to the merit issues involved, construe the evidence most strongly in favor of the claims of the party against whom the motion is made." *Buckingham v. Middlestetter* (Mar. 22, 1993), Montgomery App. No. 13575, unreported, 1993 WL 81827. Therefore, our decision, like the trial court's, is founded on the record before us, including the evidence submitted by the parties in support of their respective positions.

■ Similarly, since the interpretation of an insurance contract is a matter of law, *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm* (1995), 73 Ohio St.3d 107, 108, 652 N.E.2d 684, 685; *Johnson v. Lincoln Natl. Life Ins. Co.* (1990), 69 Ohio App.3d 249, 254, 590 N.E.2d 761, 764, we review its terms *de novo*, *Guman Bros. Farm*, 73 Ohio St.3d at 108, 652 N.E.2d at 685, citing *Ohio Bell Tel. Co. v. Pub. Util. Comm.* (1992), 64 Ohio St.3d 145, 147, 593 N.E.2d 286, 287. When construing the provisions of an insurance policy, we are mindful that "[g]enerally, * * * words in a policy must be given their plain and ordinary meaning, and only in situations where the contract is ambiguous and thus susceptible to more than one meaning must the policy language be liberally construed in favor of the claimant who seeks the benefits of coverage." *State Farm Auto. Ins. Co. v. Rose* (1991), 61 Ohio St.3d 528, 531–532, 575 N.E.2d 459, 461, overruled on other grounds by *Savoie v. Grange Mut. Ins. Co.* (1993), 67 Ohio St.3d 500, 620 N.E.2d 809. Accord *Leber v. Smith* (1994), 70 Ohio St.3d 548, 557, 639 N.E.2d 1159, 1165; *King v. Nationwide Ins. Co.* (1988), 35 Ohio St.3d 208, 519 N.E.2d 1380, syllabus; *Buckeye Union Ins. Co. v. Price* (1974), 39 Ohio St.2d 95, 99, 68 O.O.2d 56, 58, 313 N.E.2d 844, 846; *Ohio Farmers Ins. Co. v. Wright* (1969), 17 Ohio St.2d 73, 78, 46 O.O.2d 404, 406, 246 N.E.2d 552, 554.

The concept of strict interpretation applies with "greater force to language that purports to limit or to qualify coverage." *Watkins v. Brown* (1994), 97 Ohio App.3d 160, 164, 646 N.E.2d 485, 487, discretionary appeal not allowed in (1995), 71 Ohio St.3d 1458, 644 N.E.2d 1030. "However, the rule of strict construction does not permit a court to change the obvious intent of a provision just to impose coverage." *Hybud Equip. Corp. v. Sphere Drake Ins. Co., Ltd.* (1992), 64 Ohio

St.3d 657, 665, 597 N.E.2d 1096, 1102, certiorari denied (1992), 507 U.S. 987, 113 S.Ct. 1585, 123 L.Ed.2d 152.

 Initially, we address the matter of Jerry's status as regards the policy. The policy defines "insured" as "[Alverda] and residents of your household who are * * * your relatives." There is no question but that Jerry is Alverda's son and, therefore, her relative. Thus, the issue is whether Jerry is a "resident[ ] of [her] household." The term "household" is not defined in the policy. The plain and ordinary meaning of this undefined term is " ' * * * those who dwell under the same roof and compose a family: * * * a social unit comprised of those living together in the same dwelling place,' " *Shear v. W. Am. Ins. Co.* (1984), 11 Ohio St.3d 162, 166, 11 OBR 478, 481, 464 N.E.2d 545, 548, quoting Webster's Third New International Dictionary, or, alternatively, " 'the inmates of a house collectively; an organized family, including servants or attendants, dwelling in a house; a domestic establishment,' " *State Farm Fire & Cas. Co. v. Davidson* (1993), 87 Ohio App.3d 101, 106, 621 N.E.2d 887, 891, quoting the Oxford English Dictionary, motion to certify record overruled (1993), 67 Ohio St.3d 1438, 617 N.E.2d 688. Similarly, the phrase "resident of your household" has been defined as referring to "one who lives in the home of the named insured for a period of some duration or regularity, although not necessarily there permanently, but excludes a temporary or transient visitor." *Farmers Ins. of Columbus, Inc. v. Taylor* (1987), 39 Ohio App.3d 68, 528 N.E.2d 968, syllabus. The *Shear* court also stressed the nontemporary nature of the domestic living arrangements as a factor when determining if relatives are members of the same household. *Shear*, 11 Ohio St.3d at 166, 11 OBR at 481, 464 N.E.2d at 548.

 The evidence presented by the appellants fails to establish a genuine issue of material fact regarding Jerry's status as an "insured." Viewing the evidence most favorably for the appellants, we conclude that he is not covered by the policy. He testified at his deposition that he was born in 1951. Since 1993, he has lived in Arcanum with his children and their mother. However, he lists his mailing address as 320 Ashwood in Dayton—his mother's address and the policy's "insured premises." Jerry has stayed with his mother at the Ashwood residence on an "inconsistent" or "occasional" basis: he resided with his mother continuously for a month at some time between October 1993 and October 1994; he stayed with Alverda for two days between August and October 1994; he moved in and out of her home up to six times since he was eighteen—one stay could have been as long as ten months. Jerry kept bedroom furniture and some clothes at the Ashwood residence. Furthermore, he performs remodeling work and other chores at Alverda's residence, "checks on" her at different times, and regularly stops to pick up his mail. Nevertheless, he stated: "Ashwood is a mailing

address. That's my mother's. I'm not actually living there. I'm living in Arcanum."

The appellants argue that this evidence is sufficient to raise a material question regarding Jerry's status as a resident of Alverda's household or, at the very least, establishes an issue of dual residency. We disagree. Although courts will consider other factors when determining whether an individual is a resident of the insured household, including mail delivery and storage of belongings, *Davidson, supra*, and the layout and use of the residential dwelling, *Renwick v. Lightning Rod Mut. Ins. Co.* (1991), 72 Ohio App.3d 708, 710–711, 595 N.E.2d 1007, 1008–1010, the primary consideration is the nontemporary nature, *Shear, supra; Taylor, supra; Napier v. Banks* (1969), 19 Ohio App.2d 152, 156, 48 O.O.2d 263, 265, 250 N.E.2d 417, 419, or regularity of the living arrangements, *Bunch v. Nationwide Mut. Ins. Co.* (Jan. 11, 1983), Montgomery App. No. 7897, unreported 1983 WL 5014.

The appellants' evidence does not establish a genuine issue of an intent to stay at the insured premises for more than a temporary period. Although Jerry received his mail at the Ashwood address, he testified that this was for his convenience so that he would not receive mail at more than one location. The appellants did not present any evidence that Jerry's one-month stay with his mother between October 1993 and October 1994 was intended to be anything other than part of a pattern of "inconsistent," "occasional," or irregular visits. Furthermore, the Kimberlys did not show that this period was effective on the date of the mauling, let alone within the applicable policy period; the same may be said for his extended ten-month stay, which occurred sometime after his eighteenth birthday. We do not find the storage of some clothes or furniture at his mother's residence, alone, persuasive on this issue. Moreover, Jerry's statement that he lives in Arcanum is compelling evidence that he did not intend these visits, at least those beginning in 1993, to be more than temporary arrangements. Therefore, we conclude that the appellants failed to raise a genuine issue of material fact on this matter.

The appellants maintain that this evidence is sufficient to survive summary judgment on this issue because it raises a question of Jerry's dual residency. Dual residency was recognized in *Taylor, supra*, 39 Ohio App.3d 68, 70–71, 528 N.E.2d 968, 969–970, but the clear majority of cases applying this principle involves "minor children of divorced parents." *Still v. Fox* (1994), 67 Ohio Misc.2d 67, 69, 644 N.E.2d 1133, 1135.

"After reviewing Ohio caselaw in this area, we have discovered that two prominent factual elements appear in a majority of the cases in which a minor is found to be a dual resident of separate households: (1) the minor has divorced parents with whom the minor alternately resides under a custody or visitation

arrangement; and (2) the minor's dual residency generally involves a consistent living pattern between the two households which exists for a period of some duration or regularity." *Brooks v. Progressive Specialty Ins. Co.* (July 20, 1994), Summit App. No. 16639, unreported, 1994 WL 376768, discretionary appeal not allowed in (1994), 71 Ohio St.3d 1423, 642 N.E.2d 388. See, also, *Snedegar v. Midwestern Indemn. Co.* (1988), 44 Ohio App.3d 64, 541 N.E.2d 90, motion to certify record overruled (1988), 37 Ohio St.3d 712, 532 N.E.2d 142; *Taylor, supra; United Ohio Ins. Co. v. Bolin* (Apr. 11, 1989), Miami App. No. 88 CA 21, unreported, 1989 WL 35885, jurisdictional motion overruled (1989), 46 Ohio St.3d 705, 545 N.E.2d 1283; *Bolin v. State Auto. Mut. Ins. Co.* (Mar. 25, 1988), Miami App. No. 87 CA 46, unreported, 1988 WL 35291.

The appellants cite *Ziegler v. Workman* (Mar. 30, 1994), Muskingum App. No. 93–28, unreported, 1994 WL 140755, for the proposition that dual residency may apply to emancipated children. In *Ziegler*, the court affirmed a summary judgment which found that the emancipated son of the insured was covered by the insured's automobile insurance policy. The court held that the son established dual residency when he testified that he resided in his parents' household twenty-five percent of the time, and at his girlfriend's residence seventy-five percent of the time. The son also received his mail at his parents' home. The court reasoned that the emancipated status of the son was "a distinction without a difference" because the son was a relative of the insured, and the policy language did not "restrict coverage to exclusive residents [of the insured's household], or * * * allow dual residency only concerning minors." *Id.* We need not reach the issue of dual residency for emancipated children because, for the reasons previously stated, we find that the appellants did not produce evidence of a regular pattern of residency approximating that found in *Ziegler*.

We turn now to the issue which the trial court declined to address: whether the policy extends coverage to Alverda based on her allegedly tortious conduct. Section Two of the policy delineates the liability coverage ("Coverage E") provided by American States. The policy extends personal liability coverage and defense "[i]f a claim is made or a suit is brought against an 'insured' for damages because of 'personal injury' * * * caused by an 'occurrence' to which this coverage applies[.]" There is no question but that Alverda is the "insured." The policy defines "personal injury" as including "bodily injury," which it designates as "bodily harm, sickness or disease, including required care, loss of services and death that results." The policy defines "occurrence" as "an accident * * * which results, during the policy period, in * * * personal injury[.]" This policy section also provides medical payments ("Coverage F") "to a person off the 'insured location', if the 'bodily injury' * * * is caused by an animal owned by or in the care of an 'insured'."

Generally, an occurrence which gives rise to liability coverage is construed as an event that occurs outside the expectation of the insured:

"[A]n 'accident' is an event proceeding from an unexpected happening or unknown cause without design and not in the usual course of things; an event that takes place without one's expectation; an undesigned, sudden, and unexpected event; an event which proceeds from an unknown cause or is an unusual effect of a known cause and, therefore, unexpected." *Toronto v. Westfield Cos.* (Sept. 18, 1995), Jefferson App. No. 94–J–46, unreported, 1995 WL 555672.

"[T]his court finds that the word 'occurrence,' defined as 'an accident' was intended to mean just that—an unexpected, unforeseeable event." *Randolf v. Grange Mut. Cas. Co.* (1979), 57 Ohio St.2d 25, 28–29, 11 O.O.3d 110, 112, 385 N.E.2d 1305, 1307. Indeed, the typical policy definition of an "occurrence" includes terms that indicate that the "accident * * * results in injury or damage which the insured did not intend or expect." *Hybud Equip. Corp., supra,* 64 Ohio St.3d at 666, 597 N.E.2d at 1102. Although the American States' policy definition is less extensive, we construe "occurrence" here in the same fashion: an accident that the insured did not intend or expect. If Alverda harbored the lion, we conclude that her actions would constitute an "occurrence" according to the policy provisions.

For the Kimberlys to survive summary judgment, we must find that they have raised a genuine issue of material fact on the question of whether the policy extends coverage to its insured upon the allegations of this unfortunate incident. See *Preferred Mut. Ins. Co. v. Thompson* (1986), 23 Ohio St.3d 78, 80, 23 OBR 208, 209, 491 N.E.2d 688, 690 (insurer has duty to defend when allegations of complaint bring action within policy coverage). We believe this entails two separate analyses: (1) whether, based on the evidence presented by the appellants, a genuine issue is raised regarding Alverda's liability for the lion attack; and, (2) if so, whether as a matter of law, any policy exclusion relieves American States of coverage.

If an issue exists as to Alverda's potential liability, it must arise upon a showing that she was a harborer of the lion, which the Kimberlys alleged her to be in their underlying complaint. At common law, a harborer of "a wild animal * * * is subject to the same liability as if he were in possession of it." 3 Restatement of the Law 2d, Torts (1977) 24, Section 514. A "harborer" of an animal is distinguished from an "owner" or a "keeper" because " '[i]n determining whether a person is a "harborer" * * * the focus shifts from possession and control over the [animal] to possession and control of the premises where the [animal] lives.' " *Flint v. Holbrook* (1992), 80 Ohio App.3d 21, 25, 608 N.E.2d 809, 812, quoting *Godsey v. Franz* (Mar. 13, 1992), Williams App. No. 91WM000008, unreported, 1992 WL 48532, jurisdictional motion overruled (1992), 64 Ohio St.3d 1443, 596

N.E.2d 473. "Thus, a harborer is one who has possession and control of the premises where the [animal] lives, and silently acquiesces to the [animal's] presence." *Id.*, citing *Sengel v. Maddox* (C.P.1945), 31 O.O. 201, 16 Ohio Supp. 137.

We are aware that Comment *a* to the Restatement may be read to preclude liability as a harborer in some situations. The comment points out that, typically, liability turns on whether the animal is brought into the harborer's household. See 3 Restatement of the Law 2d, Torts (1977) 24–25, Section 514, Comment *a*. In this instance, we do not follow that rationale. Although Section 514 applies to harborers of wild or "abnormally dangerous domestic animal[s]," the comment raises hypothetical situations involving dogs. At common law, knowledge of a dog's dangerous propensities is a prerequisite to liability as an owner, keeper, or harborer. See *McAuliffe v. W. States Import Co.* (1995), 72 Ohio St.3d 534, 537, 651 N.E.2d 957, 959; *Bora v. Kerchelich* (1983), 2 Ohio St.3d 146, 147, 2 OBR 692, 692, 443 N.E.2d 509, 510; *Hayes v. Smith* (1900), 62 Ohio St. 161, 56 N.E. 879, paragraph one of the syllabus; *Flint*, 80 Ohio App.3d at 26, 608 N.E.2d at 812. Where wild animals, such as lions, are involved, the common law imposes strict liability upon owners, keepers, or harborers, following *Rylands v. Fletcher* (1868), L.R. 3 H.L. 330. *Morrison v. Nolan Amusement Co.* (May 1, 1985), Muskingum App. No. CA–84–31, unreported, 1985 WL 9216 (Turpin, J., dissenting). "No member of such a species, however domesticated, can ever be regarded as safe, and liability does not rest upon any experience with the particular animal." Prosser & Keeton on Torts (5 Ed.1984) 542, Section 76. Therefore, since knowledge of a wild animal's vicious tendencies is presumed, nothing is added by requiring a harborer to gain personal experience with the animal by bringing it into the harborer's household. Mere acquiescence to the animal's presence on the premises is sufficient for a harborer's liability to attach. Cf. *Hayes*, 62 Ohio St. at 183, 56 N.E. at 882 ("One may thus negligently keep and harbor a vicious dog, knowing him to be such, without being the owner of the animal; and he may thus keep and harbor a vicious dog without even owning or controlling the premises where he may be kept, and he may be chargeable with notice of the viciousness of the dog through his neglect to take notice of its vicious habits.").

First of all, we conclude that Alverda is not entitled to coverage for medical payments pursuant to Section Two of the policy. The policy terms provide medical payments "if the 'bodily injury' * * * is caused by an animal owned by or in the care of an 'insured.'" The Kimberlys complaint charged that Alverda "allowed [Jerry and Ronald] to keep and harbor a wild lion on the premises and failed to take any action to remove the lion from said premises." The Kimberlys do not assert, nor do they present any evidence to show, that

Alverda was an owner or keeper of the lion. Coupled with our finding that Jerry is not an "insured," there is no question but that the lion was not owned or cared for by an insured. The trial court providently granted summary judgment on this issue.

However, we find that the appellants have presented a genuine issue of material fact regarding Alverda's liability as a harborer. The evidence, construed in favor of the Kimberlys, shows that Alverda acquired the Brown County farm in 1978; thirty-seven acres of the land are farmed by a tenant farmer; the farm property is improved with a residence, barn, and some outbuildings; Alverda visits the property regularly; Alverda permitted Jerry and Ronald, at their request, to keep horses there; Jerry kept one lion and two tigers in chain-link cages on the property; and Jerry built five cages, measuring twenty-five by fifty by twelve feet to house the cats.

Alverda testified that she had no independent knowledge of the wild animals that Jerry owned and kept on the farm property:

"[THOMAS JENKS, Plaintiff's Counsel]:

" * * * Jerry had some exotic type animals down there; some tigers and a lion; is that your understanding?

"[ALVERDA]: I understand he did, but I never was down there enough actually to know what he had.

"Q.　I take it you never saw them?

"A.　No.

"Q.　They were not your animals?

"A.　No, they weren't.

"Q.　Those were Jerry's tigers and Jerry's lion?

"A.　Whatever he had there were his.

"Q.　And they were not your animals?

"A.　No.

"Q.　Did you have any interest in those animals of a financial way?

"A.　No, because I didn't know exactly what he had down there.

"Q.　Did you have any control over those animals?

"A.　No."

She also testified that Jerry did not ask her permission to keep the cats on her property, as he had with his horse; Jerry originally told her the cages were built

to house ostriches; she saw the support posts for the cages, but never saw the cages themselves; and she never heard any unusual noises.

In response, the Kimberlys submitted affidavits from neighbors of Alverda's farm. The neighbors testified that Alverda visited her farm "regularly almost every weekend since before 1992" and that they were aware of the presence of lions and tigers on the premises because (1) for two years prior to the attack, they could hear the cats from their residence; and (2) one neighbor was on Alverda's farm approximately three months prior to the mauling and was able to "observe large cats," although he was unable because of his distance from the cages, to determine whether the cats were lions or tigers.

Jerry testified that his lion did not attack Lee John Kimberly. In addition to Jerry's assertion that there are other "cat compounds" in the vicinity of Alverda's farm, he claimed that he had no wild cats at the time of the attack. He stated that his lion died more than a year prior to the incident and that his tigers died three months before the attack. The appellants presented affidavits of the Brown County Sheriff and a deputy sheriff. The officers testified that they responded to the report of the mauling; while the deputy was at the scene, Ronald arrived with a tranquilizer gun and "stated that it was his brother's lion"; when Ronald's attempt to tranquilize the lion failed, the officers killed it; Ronald became "irate" and "hostile"; the officers visited Alverda's farm one or two days later; the deputy observed the caged area, saw a dead chicken which had been there "a day or so" and "quite a bit of fur around the cage"; the lion the officers killed "had most of its mane gone"; the deputy believed an animal or animals had been in the cage within the prior forty-eight hours; both officers saw a "hole" or "separation" in the caged area, "about the width of a lion's body"; the cages were located between one hundred and three hundred feet behind the house; and there was a clear view of the cages from the house.

We conclude that this evidence is sufficient to raise a genuine issue of material fact regarding Alverda's liability as a harborer of the lion. Our review of the evidence indicates that reasonable minds could differ upon whether Alverda permitted or acquiesced in the lion's presence on her farm. We also find that the Kimberlys have raised a triable question on the issue of whose lion attacked the victim.

The key remaining issue is whether the policy's coverage exclusion of liability coverage for " 'bodily injury' * * * arising out of a premises * * * owned by an 'insured' * * * that is not an 'insured location' " is applicable to deny coverage based upon these facts. The appellants argue that the exclusionary language should be interpreted to require a direct, causal link between the injury and some condition upon the land before American States can deny coverage. The Kimberlys claim the exclusion is not effective because the injury can be

attributed directly to Alverda's alleged negligence, and not to any condition upon the land. The appellee urges us to construe the provision as being effective because of a direct, causal connection between the injury and the alleged harboring of the lion upon, and the lion's escape from, the farm property; in other words, the injury arose out of the premises because that is where Jerry purportedly caged the lion. Furthermore, American States argues that the risks associated with ownership of a farm sixty to seventy miles distant from the insured premises could not have been within the bargain agreed to by the parties.

Both sides have directed us to cases, primarily from our sister jurisdictions, in support of their positions. While there are no Ohio cases on all fours, the Cuyahoga County Court of Appeals construed a somewhat analogous policy exclusion in *Nationwide Mut. Fire Ins. Co. v. Turner* (1986), 29 Ohio App.3d 73, 29 OBR 83, 503 N.E.2d 212. *Turner* involved a wrongful death action filed against the estate of the insured. The court of appeals reversed a finding of summary judgment in favor of the insurer because it found, *inter alia,* that the allegedly tortious conduct by the insured arose out of the " 'ownership, maintenance or use of the real * * * property.' " *Id.* at 77, 29 OBR at 87, 503 N.E.2d at 217. " 'Arising out of the ownership, maintenance or use of the real * * * property' generally means 'flowing from' or 'having its origin in.' The phrase generally indicates a causal connection with the insured property, not that the insured premises be the proximate cause of the injury." *Id.* at paragraph four of the syllabus. See *Nationwide Ins. Co. v. Auto–Owners Mut. Ins. Co.* (1987), 37 Ohio App.3d 199, 525 N.E.2d 508, at paragraph two of the syllabus, motion to certify overruled (Sept. 2, 1987), No. 87–941, unreported (causal connection, not proximate cause, must exist between accident or injury and "ownership, maintenance or use" of insured's vehicle, when construing automobile insurance policy covering damages "arising out of the ownership, maintenance or use" of insured's vehicle).

The Kimberlys rely primarily on *Lititz Mut. Ins. Co. v. Branch* (Mo.App.1977), 561 S.W.2d 371, in support of their interpretation of the exclusionary language. In *Branch,* the insured's dog bit a girl while it was tethered on the insured's business property—property that was not covered by the terms of the insured's homeowner's policy. Although the policy provided liability coverage for an "occurrence," the insurer won a declaratory judgment in the trial court based on a policy exclusion for "bodily injury or property damage arising out of any premises, other than an insured premises, owned, rented or controlled by any insured." *Id.* at 372, fn. 1. The appellate court reversed, finding that " * * * 'premises' in common parlance and in the policy itself contemplates the land and more or less permanently affixed structures contained thereon. It does not contemplate easily moveable property which may be located on the property at a

given time or even on a regular or permanent basis. A dog, whether permanently kenneled or tethered on the property, is not a part of the premises.

"It cannot therefore be said that a dog bite arises out of—originates from, grows out of, or flows from—the premises. That it occurs upon the premises does not establish a causal connection between the bite and the premises. We find that the language used does not contemplate that the exclusion applies to liability arising from a dog bite occurring on the * * * business property. * * *" *Id.* at 373.

The court found that the policy provided two types of liability coverage: "first, that liability which may be incurred because of the condition of the premises insured; secondly, that liability incurred by the insured personally because of his tortious personal conduct, not otherwise excluded." *Id.* at 374. The court noted the policy limited the geographic scope of the former coverage, but did not so limit the latter coverage:

" * * * There appears to be little reason to exclude personal tortious conduct occurring on owned but uninsured land, as little correlation exists between such conduct and the land itself. Liability for injuries caused by an animal owned by an insured arises from the insured's personal tortious conduct in harboring a vicious animal, not from any condition of the premises upon which the animal may be located. * * *" *Id.* Accord *MFA Mut. Ins. Co. v. Nye* (Mo.App.1980), 612 S.W.2d 2.

In *Lanoue v. Fireman's Fund Am. Ins. Cos.* (Minn.1979), 278 N.W.2d 49, a minor employee of the insured's grocery store broke into the insured's locked office and took one of several bottles of whiskey that the insured had received as Christmas gifts from suppliers, but had not yet taken home. Later that night, another minor drank some of the stolen liquor and was involved in a subsequent traffic accident. Neither Lanoue's business liability insurer nor the provider of his homeowner's policy agreed to defend against the dram shop complaint filed against him. Fireman's Fund claimed an exception under its homeowner's policy for "bodily injury or property damage arising out of any premises, other than an insured premises, owned, rented or controlled by any insured." *Id.* at 53. The Minnesota Supreme Court reversed a declaratory judgment in favor of Fireman's Fund based, in part, upon its construction of Fireman's Fund's "other premises" exclusion:

"This court * * * has considered the 'arising out of' language in other contexts and concluded that causation is implied. * * * Thus, the premises must bear some causal relationship to the liability. Such a relationship is apparent when a claimant trips over improperly maintained steps. In this case, however, causation is more difficult to perceive. The fact that something occurs at a place is not sufficient by itself to imply causation as to that place. It is more appropriate

under the facts of this case to focus on the personal property—the whiskey—as being allegedly carelessly possessed by Lanoue at his office. Thus the liability is causally related to the whiskey, not the premises involved." (Citations omitted.) *Id.* at 54.

The Kimberlys also cite *Eyler v. Nationwide Mut. Fire Ins. Co.* (Ky.1992), 824 S.W.2d 855. *Eyler* involved farm property upon which the owner stored more than a million used vehicle tires. The owner conveyed the property to the insured, who attempted to clean the property by hiring an individual to roll the tires around a building and down a hill on the property. During the process, Eyler was struck and sustained serious injuries. She sued the insured. The insured sought coverage and defense from Nationwide through his homeowner's policy, but the insurer declined. Subsequently, the insured assigned his rights to Eyler, who recovered judgment against Nationwide. The court of appeals reversed, finding that an exclusion "for an occurrence 'arising out of premises owned or rented to an insured but not an insured location,'" defeated coverage. *Id.* at 857. The Kentucky Supreme Court reversed, holding that "this [exclusion] suggests the necessity for a causal connection between the premises and the injury. Ordinarily, 'arising out of' does not mean merely occurring on or slightly connected with but connotes the need for a direct consequence or responsible condition. As we view it, to satisfy the 'arising out of' exclusion in the policy, it would be necessary to show that the premises, apart from the insured's conduct thereon, was causally related to the occurrence. While most of the endeavors of mankind occur upon the surface of the earth and without it, harm could not occur, the law nevertheless imposes liability for negligent personal conduct upon the recognition that, in most cases, human behavior is the primary cause of the harm and the condition of the earth only secondary." *Id.*

The court agreed with *Branch* that the "dichotomy of causation between negligent personal conduct and dangerous condition of the premises" was dispositive. *Id.*

The appellee counters by citing a trio of cases in support of its construction of its "off premises" exclusion. In *Natl. Farmers Union Prop. & Cas. Co. v. W. Cas. & Sur. Co.* (Utah 1978), 577 P.2d 961, a horse escaped from a sheriff's department's mounted patrol drill grounds when a fence gate was left open by the patrol captain. The horse wandered onto a highway and was struck by a vehicle, causing serious injury to a passenger in the vehicle. The department was covered by the plaintiff insurer's liability coverage policy, which named the captain, as the executive officer, as the insured. The captain also carried a homeowner's policy, issued by the defendant insurer. The plaintiff settled and sought contribution from the defendant. The defendant refused contribution, and relied on a homeowner's policy exclusion for "bodily injury or property damage

arising out of any premises, other than an insured premises, owned, rented, or controlled by any insured." *Id.* at 962. Affirming summary judgment for the defendant, the Utah Supreme Court held:

"The active force leading to injury in plaintiff's complaint was an escaping horse. The term 'escape' connotes a removal from a geographical location caused by a loss of control by the one responsible for confinement. To confine the animal to the drill field, there was an enclosure around the uninsured premises. Captain Story's alleged negligence was his failure to close the gate and thus prevent the escape. The alleged acts arose from, originated, and were connected with the uninsured premises, and the exclusion in his homeowner's policy was applicable." *Id.* at 964.

The Minnesota Supreme Court, in *Arndt v. Am. Family Ins. Co.* (Minn.1986), 394 N.W.2d 791, found the insurer was entitled to summary judgment based on an exclusion in its "farm family liability policy." The plaintiff was injured while helping the insured unload frozen cornstalks from a "chopper box." The farm property upon which he was injured was not covered under the terms of the liability policy. The insurer claimed an exclusion for "any bodily injury or property damages: * * * arising out of the ownership, use or control by or rental to any insured of any premises, other than insured premises." *Id.* at 794. The trial court granted summary judgment for the insurer, but the court of appeals reversed, based upon *Lanoue, supra.* The Minnesota Supreme Court reversed, and distinguished *Lanoue:*

"Applying *Lanoue,* the Court of Appeals found that Jeffrey Arndt's injuries arose out of Ronald Kieffer's negligent use of the chopper box, rather than his ownership, use, or control of the property. *Lanoue* is factually distinguishable, however. In *Lanoue,* we did not look to the causal relation between Lanoue's liability and his ownership, use or control of the superette because the exclusion did not contain those words. The court instead focused on whether a causal relation existed between Lanoue's liability and the premises to satisfy the terms 'arising out of the premises.' In contrast, exclusion 1(d) applies to injuries arising out of Kieffer's *acts* of ownership, use or control of uninsured premises. It is clear that defendant would not have been negligently using the chopper box on New Year's Day but for his desire to provide bedding for the barn located on the uninsured * * * property. The task of providing bedding for the barn is a part of Kieffer's ownership and use of the * * * property. We conclude that a causal relation exists between Kieffer's liability and his ownership, use and control of the uninsured premises, and that exclusion 1(d) therefore bars recovery against American." (Emphasis *sic.*) *Id.* at 794–795.

The appellee also relies on a case cited by the *Arndt* court: *St. Paul Fire & Marine Ins. Co. v. Ins. Co. of N. Am.* (W.D.Va.1980), 501 F.Supp. 136. Insurance

Company of North America ("INA") issued a liability policy to the joint owners of vacation property, with a liability limit of one hundred thousand dollars. INA also issued separate homeowner's policies on the owners' respective residences. St. Paul was the excess insurer on the jointly owned property. The owners burned an outbuilding on the vacation property to remove it. The fire spread to the property of adjoining landowners and caused a quarter-million dollars in damage. INA paid to its limits under the vacation property policy, and St. Paul paid the excess. St. Paul sought indemnification from INA under the insureds' homeowner's policies, claiming that an exception for "bodily injury or property damage arising out of any premises, other than an insured premises, owned, rented or controlled by any insured * * *" did not apply. *Id.* at 138. The court disagreed, and found that the exception barred indemnification.

"Without defining its outer perimeter, the phrase is certainly broad enough to encompass a fire which spreads from a building on the premises to adjoining land. Accordingly, the insureds' liability *arose out* of their * * * premises. Second, the court finds St. Paul's suggested interpretation of the phrase 'arising out of' to be unreasonable. St. Paul argues that it was the insureds' negligence which led to their liability and not some condition of the premises. Obviously, except in cases of strict liability, liability has to be predicated upon a violation of a duty or standard of care. St. Paul must mean, therefore, that a condition of the premises which has resulted from negligence must form the basis of the insureds' liability for the exclusion to apply. That interpretation, however, reads a term into the exclusion not put there by the insurer. Had INA intended to exclude only bodily injury or property damage resulting from a *condition* of the premises, it could have so stated. Instead, INA used the more encompassing phrase— 'arising out of,' and the court is constrained to give the phrase its established meaning.

" * * * *

"Contrary to St. Paul's major premise, the facts of the present case do establish a causal nexus between the premises and the insureds' negligence giving rise to liability. There would have been no fire but for the building which the insureds desired to remove. Accordingly, the insureds' liability resulting from the fire arose out of their * * * premises." (Emphasis *sic*). *Id.* at 139.

American States finds support in these cases for its claim that, if there had been no farm property, there would have been no lion, no escape, and no injury to Lee John Kimberly. Hence, the appellee claims, the injury arose out of the property and the exclusion applies.

Appellee attempts to distinguish *Branch* and *Eyler, supra.* American States asserts that the key difference in *Branch* is that the dog bite occurred on the uninsured premises. According to the appellee, if the dog had escaped from the

premises, "any ensuing damages would have had a causal connection to the uninsured premises" and the "off premises" exclusion would have applied. American States argues that *Eyler* is inapposite because "the premises had nothing to do with the loss; rather, the loss had its sole roots in the carelessness of the employee and the manner in which he rolled the tires down the hill."

We are persuaded that the appellants' position is the proper one in determining the construction of this exception. We are mindful that, as a corollary to the premise that ambiguous insurance contract language is interpreted in favor of the insured, "in construing exceptions, 'a general presumption arises to the effect that that which is not clearly excluded from the operation of [the] contract is included' in its operation." *Weaver v. Motorists Mut. Ins. Co.* (1989), 62 Ohio App.3d 836, 839, 577 N.E.2d 703, 705, citing *Home Indemn. Co. v. Plymouth* (1945), 146 Ohio St. 96, 32 O.O. 30, 64 N.E.2d 248, at paragraph two of the syllabus, motion to certify record overruled (1989), 45 Ohio St.3d 711, 545 N.E.2d 906. We are convinced that the weight of authority construing identical or similar "off premises" exclusions recognizes the "dichotomy of causation between negligent personal conduct and dangerous condition of the premises" spoken of by the *Eyler* court, *supra,* 824 S.W.2d at 857. These jurisdictions believe that the "key factor" determinative of the applicability of this exclusion "relates to the *condition* of the uninsured premises and not to tortious acts committed thereon." (Emphasis *sic.*) *Marshall v. Fair* (1992), 187 W.Va. 109, 112, 416 S.E.2d 67, 70. See, *e.g., Sea Ins. Co., Ltd. v. Westchester Fire Ins. Co.* (S.D.N.Y.1994), 849 F.Supp. 221, affirmed (C.A.2, 1995), 51 F.3d 22; *Safeco Ins. Co. of Am. v. Hale* (Cal.App.1983), 140 Cal.App.3d 347, 189 Cal.Rptr. 463; *Hanson v. Gen. Acc. Fire & Life Ins. Corp., Ltd.* (Fla.Dist.App.1984), 450 So.2d 1260; *Economy Fire & Cas. Co. v. Green* (1985), 139 Ill.App.3d 147, 93 Ill.Dec. 656, 487 N.E.2d 100; *Kitchens v. Brown* (La.App.1989), 545 So.2d 1310; *Hingham Mut. Fire Ins. Co. v. Heroux* (R.I.1988), 549 A.2d 265; *Marshall, supra; Newhouse v. Laidig, Inc.* (App.1988), 145 Wis.2d 236, 426 N.W.2d 88.

The Kimberlys allege that Alverda negligently harbored Jerry's lion. This assertion does not implicate any condition upon the land as a direct, causal link to the injury; rather, it looks to Alverda's alleged tortious conduct in not taking adequate precautions to prevent the lion's escape. We agree with the *Branch* court's comment that, had American States desired to limit the geographic scope of its coverage for personal tortious conduct, it expressly could have done so. In this case, as in *Branch,* the insurer did not insert any such limiting language.

The cases offered in support by American States do not persuade us. The court in *Natl. Farmers Union Prop. & Cas. Co., supra,* noted that the horse's escape was caused by the captain's negligence in failing to confine the animal, but then held that the escape arose from the premises. We simply disagree with the

court's integration of personal tortious conduct and conditions upon the premises upon the facts of that case. As the *Arndt* court itself mentioned, the exclusionary language in that case differs from the terms at issue here, in that Alverda's policy does not mention the use of the property; we conclude that the *Lanoue* case provides a closer analogy. The courts in *Marshall* and *Newhouse* considered the decision in *St. Paul Fire & Marine Ins. Co.*, *supra*, to be "aberrational and * * * 'inconsistent'" with strict interpretation of exclusionary language against the insurer. *Marshall*, *supra*, 187 W.Va. at 114, 416 S.E.2d at 72, quoting *Newhouse*, *supra*, 145 Wis.2d at 241, 426 N.W.2d at 91. We agree and reject the result in *St. Paul Fire & Marine Ins. Co.*[1] Therefore, we hold that the exclusion of coverage for "'bodily injury' * * * arising out of a premises * * * owned by an 'insured' * * * that is not an 'insured location'" refers to the condition of the uninsured premises and does not exclude coverage for the insured's alleged tortious acts on the uninsured premises.

Because the Kimberlys have raised a genuine issue of material fact regarding Alverda's status as a harborer of the lion, and because we find that American States' "off premises" exclusion does not apply as a matter of law, we sustain the appellants' first assignment of error in part. We conclude that the trial court erred when it granted summary judgment in favor of American States on the issue of personal liability coverage but properly granted summary judgment for American States on the issue of medical coverage. We overrule the Kimberlys' second assignment of error, however, because triable questions remain on the issue of Alverda's alleged harboring of the lion. We conclude that the trial court did not err when it denied summary judgment for the Kimberlys.

Therefore, we reverse the judgment of the trial court in part and remand this case for further proceedings not inconsistent with this opinion.

*Judgment accordingly.*

FAIN, J., concurs.

GRADY, J., concurs in part and dissents in part.

GRADY, Judge, concurring and dissenting in part.

I respectfully dissent from the decision of the majority sustaining the second assignment of error. I would affirm the summary judgment for appellee

---

1. The district court in *St. Paul Fire & Marine Ins. Co.*, *supra*, implied that it might have held the exclusion ineffective had it been faced with an issue of strict liability. See *id.*, 501 F.Supp. at 139. We note that, although an issue of Alverda's strict liability as a harborer might have been raised by the Kimberlys in their underlying complaint, they chose to limit their theories of liability to negligence, gross negligence and/or wanton conduct.

American States Insurance Company because its policy with appellant Alverda Guillermin creates no coverage for Guillermin with respect to the claims alleged.

A policy of liability insurance imposes a duty on the insurer to defend and indemnify the insured against claims of third persons for injuries and losses that arise out of an insured risk, occurrence of which creates potential legal liability for the insured. The insurer's duty of "coverage" is therefore determined in the first instance by the occurrence of a risk identified in the policy, not by the potential liability of the insured resulting from it. See 43 American Jurisprudence 2d (1982), Insurance, Section 703.

Section II of the policy before us provides coverage for claims against an insured for personal injury or property damage and for necessary medical expenses caused by an occurrence to which the coverage applies. The Exclusions Clause within that Section states:

"Coverage E—Personal Liability and Coverage F—Medical Payments to Others do not apply to 'bodily injury' or 'property damage' * * *

"e. arising out of a premises:

"(1) owned by an 'insured' * * * that is not an 'insured location'."

The definitions section of the policy states that " 'insured location' means * * * e. vacant land, other than farm land, owned by or rented to an 'insured'."

Whether an injury and the claims of legal liability it creates "arise out of" a location is determined by the causal connection between the property and the injury alleged. *Nationwide Mut. Fire Ins. Co. v. Turner* (1986), 29 Ohio App.3d 73, 29 OBR 83, 503 N.E.2d 212. The test is functional, therefore, and does not involve a concept of fault, though fault is necessarily involved in the negligent act or omission from which the landowner's legal liability results. With respect to the occurrence that triggers the duty of coverage, therefore, the conduct of the insured is irrelevant. The only relevant inquiry is whether the chain of events resulting in the injury alleged was unbroken by the intervention of any event unrelated to the land or its particular use.

According to the allegations involved in this claim, Alverda Guillermin was negligent in allowing a lion to be kept on her land without taking adequate precautions against its escape. She is potentially liable for the injuries which Lee John Kimberley suffered as a proximate result, whether that liability results from a hazardous condition on the land or her tortious acts or omissions. In either event, however, American States has no duty of coverage under the policy because Lee John Kimberly's injuries are the direct result of an "occurrence" arising out of farm land for which coverage is expressly excluded under the terms of the policy.

I would overrule the second assignment of error on the foregoing analysis. I concur with Judge Brogan's decision overruling the first assignment.