OPINION
{¶ 1} Plaintiff, Terry Myers, appeals from summary judgments granted on the motions of Defendants, Twin Valley Plumbing, Inc. and Charles Simms Development Corporation (Simms), on claims arising from injuries Myers suffered while working for Twin Valley during construction of Simms' condominiums.
 {¶ 2} Terry Myers was employed by Twin Valley as a plumbing apprentice. Simms, a general contractor, had engaged Twin Valley as a subcontractor to install plumbing at the Bay Shores Condominium development in Centerville, which was under construction by Simms.
 {¶ 3} On November 2, 1998, while on his lunch break at the Bay Shores condominium construction site, Myers arose from the stack of drywall where he had been sitting while eating his lunch with his co-workers in order to look out a window at an approaching truck. In an attempt to get a better view of the truck, Myers took several steps backward. As he did, he was in the process of either lighting or smoking a cigarette. With his last step backwards, Myers fell through an opening between the exposed studs of an uncompleted wall and landed at the bottom of an open stairwell, eight to ten feet below. Myers suffered injuries from the fall that caused him to miss work for several months.
 {¶ 4} Myers commenced an action against both Twin Valley and Simms, presenting seven claims of relief against each Defendant. The claims were: general negligence; breach of duty as prescribed by O.A.C. 4121:1-3-4; breach of duty constituting gross, reckless, intentional and/or malicious conduct; intentional infliction of serious emotional distress; intentional infliction of emotional distress; negligent infliction of emotional distress; frequenter statute negligence; and derivative loss of consortium.
 {¶ 5} Simms and Twin Valley each moved for summary judgment on all of the claims for relief. Simms argued that it owed no duty to Myers. Twin Valley argued that (1) it is immune from liability to Myers on his claims under the Ohio Workers' Compensation Act, (2) that it did not owe a duty of care to Myers, and (3) that Myers failed to state a claim for an intentional tort.
 {¶ 6} The trial court granted summary judgements in favor of both Simms and Twin Valley on every claim alleged by Myers. Myers appeals, offering two assignments of error.
 FIRST ASSIGNMENT OF ERROR {¶ 7} "Where a general contractor actively participates in the job operation by retaining control of the safety of the workplace premises by installing and maintaining temporary safety railings where a hazard exists, the general contractor has a common law and statutory duty to protect a subcontractor's employees and may be liable for injuries sustained by the subcontractor's employee."
 {¶ 8} This assignment of error pertains to the summary judgment in favor of Simms, the general contractor.
 {¶ 9} Summary judgment may not be granted unless the entire record demonstrates that there is no genuine issue of material fact and that the moving party is, on that record, entitled to judgment as a matter of law. Civ.R. 56. The burden of showing that no genuine issue of material fact exists is on the moving party. Harless v. Willis Day WarehousingCo. (1978), 54 Ohio St.2d 64.
 {¶ 10} All evidence submitted in connection with a motion for summary judgment must be construed most strongly in favor of the party against whom the motion is made. Morris v. First National Bank Trust Co. (1970), 21 Ohio St.2d 25. "Because a trial court's determination of summary judgment concerns a question of law, we apply the same standard as the trial court in our review of its disposition of the motion; in other words, our review is de novo." Am. States Ins. Co.v. Guillermin (1996), 108 Ohio App.3d 547, 552.
 {¶ 11} Ordinarily, a general contractor who engages the services of an independent contractor owes no duty of care to the employees of the independent contractor. Sopkovich v. Ohio Edison Co. (1998),81 Ohio St.3d 628, 1998-Ohio-341. However, when a general contractor engages the services of an independent sub-contractor and "actually participates in the job operation performed by such contractor and thereby fails to eliminate a hazard which he, in the exercise of ordinary care, could have eliminated, [the general contractor] can be held responsible for the injury or death of an employee of the independent contractor."Hirschbach v. Cincinnati Gas Elec. Co. (1983), 6 Ohio St.3d 206, syllabus.
 {¶ 12} "`[A]ctive participation' includes situations in which a property owner exercises control over the work activities of the independent contractor, and also includes situations in which a property owner exercises control over a critical aspect of the employee's place of employment or `working environment.'" Sopkovich, supra at 635.
 {¶ 13} Myers argues that Simms owed him a duty of care because it actively participated in the job operation by retaining control of the safety of the workplace premises. He argues that when Simms installed and maintained temporary safety railings where hazards existed, it then had a statutory and common law duty to protect a subcontractor's employees, making it potentially liable for injuries sustained by a subcontractor's employees.
 {¶ 14} Myers relies on Cefaratti v. Mason Structural Steel Co.,Inc. (1999), 136 Ohio App.3d 363, 1998-Ohio-279. In Cefaratti, an employee of a subcontractor commenced a negligence action against the general contractor of a construction site for injuries he'd suffered when he fell in an open stairwell. The general contractor had originally installed a guard rail at the work site. It then removed the guard rail and failed to notify the workers of the change and failed to warn them to avoid the location.
 {¶ 15} The trial court granted summary judgment in favor of the general contractor. The Eighth District Court of Appeals reversed the trial court's decision. It found that although the general contractor did not actively participate in the employee's specific job activities, there was yet a genuine issue of material fact as to whether the general contractor was responsible for the absence of the guard rail and whether the absence of the guard rail constituted a critical variable in the workplace.
 {¶ 16} The Cefaratti decision was based almost exclusively onSopovich v. Ohio Edison Co., supra. Sopkovich was an employee of an independent contractor hired to paint electric substation owned and operated by electric company. He commenced an action against the electric company for injuries he sustained when he came into contact with high voltage electricity. The substation was a "transmission" substation through which high voltage electricity flowed. It was not feasible to shut off the entire flow of electricity through the substation during the painting work. However, the electric company was able to stop the flow of electricity through certain conductors in some areas of the substation so they could be painted.
 {¶ 17} Each day, prior to the commencement of the painting work, the electric company's on-site representative conferred with the president of the painting contractor, James Morakis, in the presence of the painters, to inform him which conductors were energized and which had been de-activated. Morakis then repeated that information to the painters. After informing Morakis of the energized and de-energized areas, the electric company's on-site representative would remain at the substation to answer questions and ensure that the painting work was properly completed. He also occasionally spoke directly to the painters, but these conversations were generally limited to the topic of which electrical lines or circuits were active and which had been de-energized.
 {¶ 18} At all relevant times, the electric company retained exclusive control over the determination of which electrical circuits or lines would be de-energized at the substation. It also retained exclusive control over the process of activating and de-activating the lines. Whenever the contractor finished painting an area or section that had been de-energized, the electric company executed "switching orders" to totally or partially de-energize the next area or section in which the painting work was to be completed. When this occurred, the electric company's on site representative informed Morakis of the areas that were de-energized, and Morakis then apprized the painting crew of the areas in which it was safe to paint. At all times, Morakis remained on the job site to direct and supervise the work of the painting crew and to ensure that the members of his crew did not stray into energized areas.
 {¶ 19} Sopkovich was injured by a severe electrical shock while descending from an area he had finished painting. He commenced an action against the electric company for his injuries. The trial court granted the electric company's motion for summary judgement. The court of appeals reversed the trial court and the Ohio Supreme Court affirmed the appellate court's decision.
 {¶ 20} The Supreme Court held that the electric company owed no duty of care to Sopovich arising out of its alleged control over the employee's work activities as a painter because those activities were managed and directed exclusively by the painting contractor. However, the Court held that the electric company was not entitled to summary judgment on the entire "duty of care issue" because a duty could have arisen from the electric company's "retention and exertion of control over a critical variable in the working environment, i.e., the de-electrification of specific electrical conductors in the work area." Sopkovich, supra at 635.
 {¶ 21} Myers argues that the facts of Cefaratti are similar to the present case in that there is credible evidence that Simms retained control of the stairwell and that this control constituted a critical variable in the workplace. Myers argues that Simms's site supervisor was specifically assigned the responsibility of remaining on the workplace premises daily and conducting a continuous inspection of the site for safety hazzards. Myers also claims that Simms acknowledged that if a safety hazzard existed, it was Simms' responsibility to correct or resolve the hazzard for the safety of subcontractors.
 {¶ 22} The record contains no evidence showing that Simms participated in the actual work activities of Myers or his employer, Twin Valley. Simms did not direct or control any of the work activities of Twin Valley or the job activities of the individual employees of Twin Valley. At most, Simms's on-site representative exercised a general supervisory role over the entire Bay Shores project to ensure that it was properly completed. Active participation requires more of a general contractor than exercising a general supervisory role over a project.Bond v. Howard Corp. (1995), 72 Ohio St.3d 332. A general contractor's retention of control over safety concerns does not rise to the level of active participation. Id.
 {¶ 23} Likewise, we find no evidence that Simms exercised control over a critical aspect of the work site or working environment at the Bay Shores site relating to safety. Simms neither granted nor denied permission with respect to any aspect of the job activities of the independent contractor. Simms did not exercise any control over any critical aspects of workplace that lead to Myers' injuries.
 {¶ 24} Unlike Cefaratti, and contrary to Myers' assertions, there is no evidence that Simms ever took an active role in providing or installing any safety railings at the Bay Shores site. Nor is there any evidence that it removed any safety railings at the site. We find no evidence showing that Simms's supervisory role in the Bay Shores project in any way rises to the level of retention and exertion of control over a critical variable in the working environment of Myers, as was the case inSopovich.
 {¶ 25} We agree with the trial court that Simms did not actively participate in the work activities of Twin Valley or any other subcontractor at the Bay Shores site. Accordingly, we overrule this assignment of error.
 SECOND ASSIGNMENT OF ERROR {¶ 26} "Where expert testimony establishes that an injury is substantially certain to occur to an employee on a worksite where the employer failed to install temporary guard railing and toe boards in violation of a specific mandatory safety requirement promulgated under the Ohio Administrative Code 4121:1-3-4 and where the evidence confirms the employer understood the need for a protective guard rails at the worksite and retains control over both the placement of said safety rails and the safety of the worksite, the employer may be held liable for any intentional tort in favor of the employee if the employee is injured as a result of the failure of the employer to install such temporary guard railing and toeboards."
 {¶ 27} Myers argues that the Twin Valley may be held liable for an intentional tort because he was injured as a result of Twin Valley's failure to install temporary guard railing and toeboards at the opening through which he fell. He argues that his expert's testimony establishes that the injury was substantially certain to occur because Twin Valley failed to install temporary guard railing and toe boards in violation of O.A.C. 4121:1-3-4. He also argues that the evidence shows that Twin Valley understood the need for protective guard rails at the work site, and that Twin Valley retained control over both the placement of said safety rails and the safety of the work site.
 {¶ 28} In Fyffe v. Jeno's, Inc. (1991), 59 Ohio St.3d 115, the Ohio Supreme Court found that "in order to establish `intent' for the purpose of proving the existence of an intentional tort committed by an employer against his employee, the following must be demonstrated: (1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task." Fyffe, supra at paragraph 1 of syllabus.
 {¶ 29} The Fyffe court found that "to establish an intentional tort of an employer, proof beyond that required to prove negligence and beyond that to prove recklessness must be established. Where the employer acts despite his knowledge of some risk, his conduct may be negligence. As the probability increases that particular consequences may follow, then the employer's conduct may be characterized as recklessness. As the probability that the consequences will follow further increases, and the employer knows that injuries to employees are certain or substantially certain to result from the process, procedure or condition and he still proceeds, he is treated by the law as if he had in fact desired to produce the result. However, the mere knowledge and appreciation of a risk — something short of substantial certainty — is not intent."Id., paragraph 2 of syllabus (citations omitted).
 {¶ 30} To satisfy the first prong of Fyffe, an employee must demonstrate that (1) there was a dangerous condition within the employer's business operation and (2) that the employer had knowledge that the dangerous condition existed. Moebius v. General Motors Corp.
(2002), Montgomery County App. No. 19147.
 {¶ 31} Myers testified that he fell straight back through the opening between exposed wall studs and landed at the bottom of the stairwell below. The opening between the studs was later measured and found to be 14 1/2 inches. The record shows that the span of Myers' shoulders is roughly twenty inches wide. Therefore, construing the evidence in a light most favorable to Myers, as Civ.R. 56 mandates, we find evidence which supports an inference that the aperture through which Myers fell was then likely wider than the measured distance between the studs, making it a potentially dangerous condition.
 {¶ 32} What we cannot find, however, is any evidence that Twin Valley had knowledge that the dangerous condition existed. In determining whether an employer had knowledge that a dangerous condition existed, "we must determine whether the employer had actual knowledge of the dangerous condition." Moebius, supra. "[T]he fact that the employer should have known it was requiring the employee to work under such dangerous conditions that he would certainly be injured is not enough to establish a case in intentional tort." Fultz v. Baja Boats, Inc. (1994), Crawford Co. App. No. 3-93-10. Instead, "the determination rests upon a claimant's alleging facts which show the employer's actual knowledge of the situation." Id.
 {¶ 33} The trial court found that Myers failed to satisfy the first prong of the Fyffe test. It found that there was no evidence showing that Twin Valley knew of an unsafe condition within the Bay Shores project. We agree.
 {¶ 34} Testimony of Twin Valley's owner showed that the company would not allow its employees to enter a building unless it was determined to be safe. Additionally, a Twin Valley supervisor testified that "everything that was unsafe in the building was taken care of." (Ireland Depo. 15). While that assertion of fact is necessarily belied by the injuries Myers suffered, it supports an inference that Twin Valley was unaware of the hazard from which those injuries resulted. Myers offers no evidence to the contrary, which is necessary to avoid summary judgment. Dresher v. Burt, 75 Ohio St.3d 280, 1996-Ohio-107.
 {¶ 35} The assignment of error is overruled.
 Conclusion {¶ 36} Having overruled the assignments of error presented, we will affirm the judgment from which this appeal was taken.
WOLFF, P.J. and BROGAN, J., concur.