[Cite as *Gibbons v. Shalodi*, 2021-Ohio-1910.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

NADIA GIBBONS, Administrator of the
Estate of N.G., Deceased

      Appellant

      v.

SUMMER SHALODI, et al.

      Appellees

C.A. No.     19CA011586

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF LORAIN, OHIO
CASE No.    17CV193745

DECISION AND JOURNAL ENTRY

Dated: June 7, 2021

CALLAHAN, Presiding Judge.

{¶1} Appellant, Nadia Gibbons, administrator of the estate of N.G., appeals from the judgment of the Lorain County Common Pleas Court. For the reasons set forth below this Court affirms in part and reverses in part.

I.

{¶2} In early 2015, Summer Shalodi met Ms. Gibbons and her daughter, N.G., while working as a teacher. Ms. Shalodi and Ms. Gibbons became friends. Ms. Shalodi was fond of N.G. and babysat the child on many occasions, including at her townhouse.

{¶3} In the afternoon of December 12, 2015, Ms. Gibbons brought seventeen-month-old N.G. to Ms. Shalodi's townhouse for an overnight babysitting stay. Late that evening and into the early morning hours of the next day, Ms. Shalodi left N.G. alone in her townhouse while she went to the movies and shopped. Ms. Shalodi returned to the townhouse sometime after 2:00 a.m. on December 13, 2015 and found N.G. unresponsive. Ms. Shalodi attempted, unsuccessfully, to

revive N.G.  At 6:34 a.m., Ms. Shalodi called 911, but the paramedics were unable to revive N.G. The coroner determined N.G. died from the combined effects of head trauma and alprazolam[1] intoxication.

{¶4}    Ms. Shalodi was charged with multiple counts in N.G.'s death.  Ms. Shalodi pled guilty to involuntary manslaughter, endangering children, and corrupting another with drugs and was sentenced to prison.  Thereafter, Ms. Gibbons, as the administrator of the estate of N.G., filed a civil suit against Ms. Shalodi alleging claims for survivorship and wrongful death and seeking punitive damages.

{¶5}    Four and a half months prior to N.G.'s death, Ms. Shalodi leased a townhouse and moved her personal belongings into the townhouse.  Prior to leasing the townhouse, Ms. Shalodi had lived with her sister, R.H., and her brother-in-law in their house.  Between August 2015 and December 2015, Ms. Shalodi spent time at both her townhouse and her sister's house.  At the time of N.G.'s death R.H. had a homeowners insurance policy through Westfield National Insurance Company ("Westfield").  Westfield denied coverage to Ms. Shalodi and intervened in Ms. Gibbons' lawsuit, seeking a declaratory judgment that it did not owe a duty to defend and indemnify Ms. Shalodi against Ms. Gibbons' claims.

{¶6}    Westfield filed a motion for summary judgment on its declaratory judgment claim. Ms. Shalodi did not file a brief in opposition to Westfield's motion for summary judgment; only Ms. Gibbons opposed Westfield's motion.  The trial court granted summary judgment in favor of Westfield on the basis that Ms. Shalodi was not a resident of her sister's household and thus not an insured under the policy and entered a judgment declaring that Westfield did not owe a duty to indemnify Ms. Shalodi against Ms. Gibbons' claims.

---

[1] Alprazolam is the generic name for Xanax.

**{¶7}** Two weeks before trial, Ms. Shalodi's counsel, at her request, filed a motion to withdraw as counsel. At a hearing, Ms. Shalodi consented to the withdrawal of counsel and further indicated that she did not want to "participate, in any way, in the jury trial." Counsel's motion to withdraw was granted and the jury trial proceeded with the magistrate presiding and without Ms. Shalodi's presence or defense. The jury returned verdicts in favor of Ms. Gibbons, as the administrator of the estate of N.G., and awarded compensatory damages of $5,000,000 for the survivorship claim and $30,250,000 for the wrongful death claim, and punitive damages in the amount of $35,250,000.

**{¶8}** The magistrate filed a magistrate's decision noting that Ms. Shalodi had not filed any post-trial motions challenging the jury's verdicts and recommending that a judgment be issued based upon the jury's verdicts which were attached thereto. No objections were filed to the magistrate's decision. The trial court adopted the magistrate's decision as to the compensatory damages awarded for the survivorship and wrongful death claims and rejected and vacated the punitive damages award.

**{¶9}** Ms. Gibbons timely appealed, asserting two assignments of error.

II.

### ASSIGNMENT OF ERROR NO. 1

THE TRIAL COURT ERRED IN GRANTING WESTFIELD NATIONAL INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT, AS QUESTIONS OF MATERIAL FACT PRECLUDED A FINDING THAT [R.H.'S] HOMEOWNER'S INSURANCE POLICY DID NOT COVER [MS.] SHALODI.

**{¶10}** Ms. Gibbons argues that the trial court erred in granting summary judgment in favor of Westfield and declaring that Ms. Shalodi was not covered under her sister's homeowners insurance policy. We disagree.

{¶11}  This Court reviews a trial court's decision granting summary judgment de novo. *See Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996).  Summary judgment is proper under Civ.R. 56(C) when:  (1) no genuine issue as to any material fact exists; (2) the party moving for summary judgment is entitled to judgment as a matter of law; and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can only reach one conclusion, and that conclusion is adverse to the nonmoving party.  Civ.R. 56(C); *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327 (1977).

{¶12}  Summary judgment consists of a burden-shifting framework.  The movant bears the initial burden of demonstrating the absence of genuine issues of material fact concerning the essential elements of the nonmoving party's case.  *Dresher v. Burt*, 75 Ohio St.3d 280, 292 (1996).  Specifically, the moving party must support the motion by pointing to some evidence in the record of the type listed in Civ.R. 56(C).  *Id.* at 292-293.  Once the moving party satisfies this burden, the nonmoving party has a "reciprocal burden" to "'set forth specific facts showing that there is a genuine issue for trial[.]'"  *Id.* at 293, quoting Civ.R. 56(E).

{¶13}  Westfield filed a motion for summary judgment as to its declaratory judgment claim regarding its duty to indemnify Ms. Shalodi in relation to Ms. Gibbons' claims.  Westfield asserted three alternate bases as to why it owed no duty to indemnify Ms. Shalodi:  1) she was not an insured under the policy, 2) coverage under the policy was not triggered because Ms. Shalodi's conduct was not an occurrence, and 3) coverage under the policy was excluded pursuant to coverage exclusions for intentional acts or bodily injury arising from physical abuse and/or use of controlled substances.  The trial court granted summary judgment in favor of Westfield solely on the basis that Ms. Shalodi was not a resident of her sister's household and thus not an insured under the policy.

{¶14} The Westfield homeowners insurance policy provides coverage to those insured under the policy. The Westfield policy defines "'Insured'" as including "any family member." Additionally, the policy defines "'Family member,'" in pertinent part, as "a person related to you by blood, marriage or adoption who is a resident of your household." The terms "'you'" and "'your'" are also defined in the policy as the "'named insured' shown in the Declarations." The policy, however, does not define the words "resident" or "household" or the phrase "resident of your household."

{¶15} In order for Ms. Shalodi to be an insured under the Westfield policy she must be both related to the named insured and a resident of the named insured's household. There is no dispute that Westfield issued a policy to R.H., she was the named insured on the Declarations Page, and the policy was in effect at the time of N.G.'s death. Nor is there any dispute that Ms. Shalodi and R.H. are sisters related by blood. The only dispute is whether Ms. Shalodi was a resident of R.H.'s household.

{¶16} Given that the Westfield homeowners insurance policy does not define "household," "resident," or "resident of your household," these words must be given their plain and ordinary meaning. *See Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 73 Ohio St.3d 107, 108 (1995). *See, e.g., Shear v. West Am. Ins. Co.*, 11 Ohio St.3d 162, 166 (1984) (applying the "common, ordinary, usual meaning" of "'household'" when the term was not defined in the insurance policy); *Prudential Property & Cas. Ins. Co. v. LaMarr*, 92 Ohio App.3d 331, 334 (9th Dist.1993) (applying the plain and ordinary meaning of "'[r]esident'" when the term was not defined in the insurance policy.). In *Shear*, the Ohio Supreme Court defined the term "'household,'" when used in an insurance policy, as "'* * * those who dwell under the same roof and compose a family: * * * a social unit comprised of those living together in the same dwelling

place * * *.'" (Alterations in original.) *Id.* at 166, quoting *Webster's Third New International Dictionary.* Additionally, the term "'resident'" in the phrase "'resident of your household'" in an insurance policy has been recognized in all of the Ohio appellate districts as meaning "one who lives in the home of the named insured for a period of some duration or regularity, although not necessarily there permanently, but excludes a temporary or transient visitor." *Farmers Ins. of Columbus, Inc. v. Taylor*, 39 Ohio App.3d 68, 70 (10th Dist.1987); *Flynn v. State Farm Mut. Auto., Ins. Co.*, 554 Fed.Appx. 430, 434-435 (6th Cir.2014), fn. 5 (collecting cases). *Accord Grange Mut. Cas. Co. v. Norton*, 9th Dist. Medina No. 10CA0105-M, 2011-Ohio-6195, ¶ 8.

{¶17} The primary consideration in determining whether a person is a resident of the insured household is the "nontemporary nature * * * or regularity of the living arrangements." *Am. States Ins. Co. v. Guillermin*, 108 Ohio App.3d 547, 554 (2d Dist.1996), citing *Shear* at 166; *Taylor* at 70; *Napier v. Banks*, 19 Ohio App.2d 152, 156 (2d Dist.1969); and *Bunch v. Nationwide Mut. Ins. Co.*, 2d Dist. Montgomery No. 7897, 1983 WL 5014 (Jan. 11, 1983). While there are other factors, such as the storage of belongings, receipt of mail, and the design and use of the dwelling, that the court can consider when deciding whether a person is a resident of the insured's household, these factors are not the primary consideration in the analysis. *See Guillermin* at 554 (collecting cases). *See, e.g., State Farm Fire & Cas. Co. v. Davidson*, 87 Ohio App.3d 101, 108 (2d Dist.1993) (The court noted that other factors were present, but looked "most closely at whether [the person's] contacts with [insured's] household were sufficiently permanent, long-term, or regular to make him a member."); *Brooks v. Progressive Specialty Ins. Co.*, 9th Dist. Summit No. 16639, 1994 WL 376768, *6 (July 20, 1994), citing *Davidson* at 108 (This Court noted that other factors were material to the issue of residency, but looked at the permanence, duration, and regularity of the visits.); *Clifton v. Martin*, 1st Dist. Hamilton No. C-950376, 1996

WL 34142, *2 (Jan. 31, 1996) (While there were other factors present, the court focused on the time spent at the insured's home.). Nor are these other factors, standing alone, determinative regarding whether a person is a resident of the insured's household. *See, e.g., Guillermin* at 554 (The court did not find "the storage of some clothes or furniture at [the insured's] residence, alone, persuasive" as to the person's intent to stay at the insured's house for more than a temporary period.); *W. Res. Mut. Ins. Co. v. Campbell*, 111 Ohio App.3d 537, 544 (9th Dist.1996), citing *Davidson* at 107 ("Maintenance of a mailing address is, in itself, insufficient to establish residency.").

{¶18} Similarly, a person's intent to make a residency permanent is not the primary, critical, or determinative factor when deciding if a person is a resident of the insured's household. *Cincinnati Ins. Co. v. Minser*, 2d Dist. Montgomery No. 10976, 1989 WL 567, *2 (Jan. 4, 1989). *See Flynn* at 436-437. Nonetheless, the person's intent is a factor for the court's consideration. *See Minser* at *2. *See also Flynn* at 437. The person's subjective intent can be expressed by a statement as to where he or she lives. *See Guillermin* at 553-554 (Son's statement that he lived in another city with his children and their mother expressed his intention that his visits to his mother were temporary arrangements.). The person's subjective intent also may "be measured by outward or objective manifestations." *Malone v. Nationwide Mut. Ins. Co.*, 6th Dist. Erie No. E-85-3, 1986 WL 1306, *2 (Jan. 31, 1986).

{¶19} Additionally, the court can consider the insured's belief regarding where the person lived. *See Nationwide Ins. Co. v. Alli*, 178 Ohio App.3d 17, 2008-Ohio-4318, ¶ 32-33 (7th Dist.). Like the other factors above, the insured's belief is not determinative in the analysis of whether the person is a resident of the insured's household. *See id.* (The appellate court applied "the 'duration and regularity' standard" to conclude that the grandson was a resident of his insured

grandmother's household, notwithstanding the grandmother's statement that her grandson did not live in her condominium and was only visiting overnight.).

{¶20} Ms. Shalodi testified in her deposition that after having lived with her sister and brother-in-law for three years, she, with her father as a co-signor, signed a lease for a townhouse in August 2015. Ms. Shalodi's father paid the monthly lease. Ms. Shalodi stated that she bought new furniture for the townhouse and moved her personal belongings from her sister's house to the townhouse.

{¶21} Ms. Shalodi explained that "a week or two before [she] moved into the [townhouse]" she had changed her address with the post office and had her mail forwarded to the townhouse. Ms. Shalodi indicated that she told other people that she lived at the townhouse. Ms. Shalodi considered herself to be living in the townhouse, and not as a resident of her sister's household. However, Ms. Shalodi's driver's license still reflected her sister's address.

{¶22} Ms. Shalodi stated that after she had moved into the townhouse she would stay overnight at her sister's house. She, however, could not recall the average number of days per week she would stay at her sister's house. Additionally, she indicated that the days of the week that she stayed with her sister varied. Ms. Shalodi also testified that she still had a key to her sister's house and she would come and go as she pleased. These overnight visits took place between August 2015 and December 2015. When she stayed overnight at her sister's house, she would use the same bedroom that she had used when she had lived there previously. Ms. Shalodi testified that she thought that she had left some clothes at her sister's house for when she would stay there, but she could not recall for certain. Additionally, she could not recall if she kept any toiletries at her sister's house.

{¶23} Prior to this action being filed, Ms. Shalodi's sister, R.H., appeared for an examination under oath as part of Westfield's investigation in this matter. R.H.'s sworn statement mirrored much of her sister's testimony and added some details about Ms. Shalodi's stays at R.H.'s house between August 2015 and December 2015.

{¶24} In her sworn statement, R.H. stated that after Ms. Shalodi leased the townhouse, she would spend three to four nights a week at R.H.'s house, but the visits were random. To that end, R.H. explained that she did not know when Ms. Shalodi would be at her house: "I would come home and find her at home and sometimes I wouldn't find her at home." Nor did R.H. keep track of or contact Ms. Shalodi to confirm when she would be staying at R.H.'s house. R.H. indicated there was no set schedule of days or times of the day when Ms. Shalodi would stay at R.H.'s house. Instead, Ms. Shalodi had a key and "came and went as she pleased." R.H. further stated that during this time, Ms. Shalodi kept clothes and toiletries and continued to store her furniture from her previous apartment at R.H.'s house. Additionally, R.H. claimed that Ms. Shalodi received mail at both R.H.'s house and Ms. Shalodi's townhouse. R.H. indicated that the house was open to Ms. Shalodi and it was her and her husband's "intent that [Ms. Shalodi] be a resident of our home" and that Ms. Shalodi would continue to live with her and her husband and "[i]t was still her home."

{¶25} Ms. Gibbons argues that the primary consideration in determining whether a person is a resident of the insured's household is "'the nontemporary nature * * * or regularity of the living arrangements'" and that based upon the "entirety" of Ms. Shalodi's testimony and R.H.'s sworn statement there is a genuine issue of material fact as to Ms. Shalodi's status as a resident of R.H.'s household. Specifically, Ms. Gibbons argues that the testimony establishes that Ms. Shalodi's contacts with R.H.'s household were "regularized," thereby rendering her a resident of

R.H.'s household. While we agree with Ms. Gibbons' statement of the law, we do not agree with her position that the testimony established that Ms. Shalodi's contacts with R.H.'s household were "regularized."

{¶26} Although Ms. Shalodi met some of the criteria that a court can consider when determining whether a person is a resident of the insured's household, we must focus our inquiry on whether Ms. Shalodi's contacts with R.H.'s household "were sufficiently permanent, long-term, or regular" to qualify her as a resident. *See Davidson*, 87 Ohio App.3d at 108. *See also Clifton*, 1996 WL 34142, at *2 (The "focus is on the time spent at [the insured's] home."). Ms. Shalodi spent three to four nights a week at her sister's house. Both Ms. Shalodi's and R.H.'s testimony characterized these visits as being random, varied, and unscheduled, with Ms. Shalodi "com[ing] and go[ing] as [she] pleased." Moreover, R.H. expressed that she did not know when Ms. Shalodi would be at her house. Ms. Shalodi's possession of a key to R.H.'s house provided her access to her sister's house to come over whenever she wanted. But because of the unpredictable and inconsistent nature of Ms. Shalodi's stays at her sister's house, Ms. Shalodi's possession of the key to her sister's house does not establish permanency or regularity in Ms. Shalodi's contacts with R.H.'s household. Based upon these undisputed facts, we cannot agree that Ms. Shalodi's overnight stays were sufficiently permanent, long-term, or regular for her to be a resident of R.H.'s household.

{¶27} Ms. Gibbons argues that the facts in this matter are akin to *Snedegar v. Midwestern Indemn. Co.*, 44 Ohio App.3d 64 (10th Dist.1988) and *Bunch*, 1983 WL 5014. Her reliance upon *Snedegar* and *Bunch* is misplaced as those cases are factually distinguishable.

{¶28} In *Snedegar*, the Tenth District Court of Appeals held that the deceased minor child was a dual resident of both his father's and his mother's households for insurance purposes. *Id.* at

68. As to his father's household, the child stayed at his father's house one to two nights a week pursuant to the terms of a dissolution decree, received mail and telephone calls there, kept clothes and personal belongings at his father's house on a permanent basis, and participated in activities with his father and step-mother. *Id.* at 65, 68. This living arrangement was in place from 1977 to 1984. *Id.* at 64-65. The court held that the child was a resident of his father's household because "this living arrangement had been permanent and on a regular basis for several years." *Id.* at 68. Unlike the facts in *Snedegar*, Ms. Shalodi's overnight stays were not permanent and lacked a regular schedule. Nor did Ms. Gibbons argue that Ms. Shalodi was a dual resident like the minor child in *Snedegar*.

{¶29} In *Bunch*, the Second District Court of Appeals held that a man was a resident of his brother's household. *Id.* at *3. With respect to the brother's household, the man moved some of his furniture into his brother's house, he was invited to stay at his brother's house for an extended time, the man had stayed at his brother's house for over six months at the time he was injured, and he stayed at his brother's house Friday evenings through Monday mornings and would share his weekend meals with his brother and sister-in-law. *Id.* at *2-3. We recognize that there are similarities between *Bunch* and this matter with regard to the other factors that a court can consider. However, the primary consideration in determining that a person is a resident of the insured's household is the duration, regularity, and permanency of the residence. *See Davidson*, 87 Ohio App.3d at 108, citing *Snedegar* at 69. *See also Guillermin*, 108 Ohio App.3d at 554. In *Bunch*, the man's contacts with his brother's household occurred on a regular basis, every Friday evening through Monday morning. *Id.* at *2. Unlike *Bunch*, Ms. Shalodi's overnight stays at her sister's house were random, varied, and unscheduled.

**{¶30}** Ms. Gibbons' brief also suggests that there is a genuine issue of material fact because Ms. Shalodi and R.H. had different beliefs about where Ms. Shalodi lived. Additionally, Ms. Gibbons argues that Ms. Shalodi's testimony regarding her residency status is not determinative while R.H.'s testimony as to Ms. Shalodi's residency is relevant and determinative. Ms. Gibbons further argues that the trial court erred in not considering R.H.'s testimony regarding the circumstances of Ms. Shalodi's living arrangement, and by doing so it improperly weighed the evidence.

**{¶31}** Based upon the case law stated earlier, Ms. Shalodi's intent and R.H.'s belief as to where Ms. Shalodi lived are factors that the court can consider, but are not determinative factors in the analysis regarding whether Ms. Shalodi is a resident of R.H.'s household. *See Minser*, 1989 WL 567, at *2 (person's intent); *Alli*, 178 Ohio App.3d 17, 2008-Ohio-4318, at ¶ 33 (insured's belief). *See, e.g., Clifton*, 1996 WL 34142, at *2 (The court did not base its decision on son's and parents' beliefs as to where son lived.). Ms. Gibbons' argument in this regard is an attempt to resolve the issue of whether Ms. Shalodi was a resident of R.H.'s household based upon R.H.'s belief alone. Ms. Gibbons' argument is contrary to the above case law, and not well-taken.

**{¶32}** Ms. Gibbons also suggests that the difference in Ms. Shalodi's intent and R.H.'s belief as to where Ms. Shalodi lived creates a genuine issue of material fact. We disagree. While the conflicting testimony is material, it is not genuine.

**{¶33}** The mere presence of a disputed fact does not preclude summary judgment. *Trojan v. Ro-Mai Industries, Inc.*, 9th Dist. Summit No. 18778, 1998 WL 488715, * 3 (Aug. 19, 1998). Rather, summary judgment is inappropriate when the factual dispute is both material and genuine. *See id*. "A disputed fact is material if it is an essential element of the claim as determined by the applicable substantive law-one which might affect the outcome of the litigation." *Id*., citing

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) and *Burkes v. Stidham*, 107 Ohio App.3d 363, 371 (8th Dist.1995). "[T]he dispute about a material fact is 'genuine' * * * if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson* at 248. To determine whether a genuine issue exists, "a court must inquire 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Wall v. Firelands Radiology, Inc.*, 106 Ohio App.3d 313, 322-323 (6th Dist.1995), quoting *Anderson* at 251-252 and *Turner v. Turner*, 67 Ohio St.3d 337, 340 (1993). "If disputed evidence is not 'significantly probative,' summary judgment should be granted." *Harold v. Bridgestone/Firestone, Inc.*, 9th Dist. Summit No. 18915, 1998 WL 646626, *3 (Sept. 16, 1998), quoting *Buckeye Union Ins. Co. v. Consol. Stores Corp.*, 68 Ohio App.3d 19, 22 (10th Dist.1990).

{¶34} In this case, the material facts are those which are relevant to whether Ms. Shalodi was a resident of R.H.'s household. While the primary consideration to this issue is the duration, regularity, and permanency of the residence, other nondeterminative factors may be considered by the court. *See Guillermin*, 108 Ohio App.3d at 554. *See also Brooks*, 1994 WL 376768, at *6 (this Court recognized other factors are material to the issue of residency). This includes the intent of Ms. Shalodi as to the permanency of her residency and R.H.'s belief regarding where Ms. Shalodi lived. *See Minser*, 1989 WL 567, at *2 (person's intent); *Alli*, 178 Ohio App.3d 17, 2008-Ohio-4318, at ¶ 33 (insured's belief). While these factors are not determinative, they are relevant because the court can consider these factors in making its decision as to whether Ms. Shalodi is a resident of R.H.'s household. Accordingly, this disputed fact "might affect the outcome of the litigation," and thereby is material. *See Trojan* at *3, citing *Anderson* at 248 and *Burkes* at 371.

{¶35} While these contradictory statements are material, they are not genuine. Based upon our analysis above, the testimony regarding the duration, regularity, and permanency of the living arrangement, when construed in the light most favorable to Ms. Gibbons, was such that a reasonable jury could not return a verdict for Ms. Gibbons. We recognize that there was testimony regarding other nondeterminative factors, such as mail delivery, storage of belongings, and Ms. Shalodi's intent and R.H.'s belief as to where Ms. Shalodi lived. However, this Court looks closely at the testimony regarding Ms. Shalodi's contacts with R.H.'s household and applies the factors which are primary to the determination. Notwithstanding the other nondeterminative factors, as a matter of law Ms. Shalodi's overnight visits were not sufficiently permanent, long-term, or regular for her to be a resident of her sister's household. *See Davidson*, 87 Ohio App.3d at 108*; Clifton*, 1996 WL 34142, at *2; *Brooks* at *6. Thus, the disputed testimony regarding Ms. Shalodi's intent and R.H.'s belief is not "'significantly probative'" of whether Ms. Shalodi was a resident of R.H.'s household. *See Harold* at *3, quoting *Buckeye Union Ins. Co.* at 22. Accordingly, Ms. Gibbons has failed to show that this disputed material fact is genuine.

{¶36} Moreover, we conclude that the trial court did not weigh the evidence as to Ms. Shalodi's and R.H.'s statements concerning where Ms. Shalodi lived. While the trial court's explanation was inartfully worded, it nonetheless reflected the principles addressed above. Nor can we conclude that the trial court "anchor[ed] its decision" on Ms. Shalodi's statement as to where she lived and discounted the remaining testimony of Ms. Shalodi and R.H. The trial court's decision reflects citation to and reliance upon other portions of Ms. Shalodi's testimony regarding her living arrangements. And while the trial court did not reference R.H.'s testimony regarding Ms. Shalodi's living arrangements, the testimony of R.H. and Ms. Shalodi was consistent and not in dispute. Thus, there was no weighing of the evidence.

{¶37} In light of the foregoing, we conclude that there are no genuine issues of material fact and viewing the evidence in the light most strongly in favor of Ms. Gibbons, reasonable minds can only come to one conclusion: Ms. Shalodi was not a resident of R.H.'s household. Therefore, the trial court did not err in granting Westfield's motion for summary judgment on the basis that Ms. Shalodi was not a resident of R.H.'s household, and thereby not an insured under the policy, and entering a judgment declaring that Westfield did not have a duty to indemnify Ms. Shalodi with regard to Ms. Gibbons' claims.

{¶38} Ms. Gibbons also argues that there are genuine issues of material fact as to Westfield's two alternate arguments for summary judgment related to insurance coverage under the policy. We decline to address these additional arguments as they have been rendered moot by our conclusion that Ms. Shalodi was not a resident of R.H.'s household.[2] *See* App.R. 12(A)(1)(c).

{¶39} Ms. Gibbons' first assignment of error is overruled.

### ASSIGNMENT OF ERROR NO. 2

THE TRIAL COURT ERRED IN STRIKING THE JURY'S PUNITIVE DAMAGE AWARD AGAINST [MS.] SHALODI AS THE TRIAL COURT HAD NO AUTHORITY TO STRIKE THE AWARD SUA SPONTE AND DOING SO WAS AN ABUSE OF DISCRETION.

{¶40} Ms. Gibbons argues that the trial court had no authority to strike the punitive damages award against Ms. Shalodi and that the trial court abused its discretion in doing so. We agree.

{¶41} This Court generally reviews a trial court's decision adopting, rejecting, or modifying a magistrate's decision for an abuse of discretion. *Barlow v. Barlow*, 9th Dist. Wayne

---

[2] Additionally, we decline to consider the merits of Westfield's two alternate arguments for summary judgment because the trial court did not decide these alternative arguments, and we will not do so in the first instance. *See Shaffer v. A.W. Chesterton Co.*, 9th Dist. Lorain No. 18CA011440, 2019-Ohio-5022, ¶ 61.

No. 08CA0055, 2009-Ohio-3788, ¶ 5. However, "[i]n so doing, we consider the trial court's action with reference to the nature of the underlying matter." *Tabatabai v. Tabatabai*, 9th Dist. Medina No. 08CA0049-M, 2009-Ohio-3139, ¶ 18. "[W]hether the trial court correctly applied the law to the facts of a case presents a question of law." *Fuline v. Green*, 9th Dist. Summit Nos. 25704, 25936, 2012-Ohio-2749, ¶ 6. Questions of law are reviewed de novo. *Swedlow v. Riegler*, 9th Dist. Summit No. 26710, 2013-Ohio-5562, ¶ 7.

{¶42} Civ.R. 53(C)(1)(c) provides that a magistrate may preside over a jury trial upon the unanimous written consent of the parties. In any matter referred to a magistrate, including presiding over a jury trial with the consent of the parties, the magistrate is required to prepare a magistrate's decision. Civ.R. 53(D)(3)(a)(i); *Dixon v. O'Brien*, 7th Dist. Mahoning No. 09 MA 123, 2011-Ohio-3399, ¶ 28, citing Civ.R. 53(D)(1) and Civ.R. 53(C)(1)(a) and (c). *See Ford v. Gooden*, 9th Dist. Summit No. 22764, 2006-Ohio-1907, ¶ 9. Parties consenting to a jury trial in front of the magistrate may file objections to the magistrate's decision.[3] *Brown v. Burnett*, 2d Dist. Clark No. 2017-CA-86, 2018-Ohio-2328, ¶ 9, citing *Hartt v. Munobe*, 67 Ohio St.3d 3, 6 (1993). When ruling on timely objections following a jury trial before a magistrate, the trial court must perform an independent review of the objected matters to determine whether the magistrate "appropriately applied the law." *See* Civ.R. 53(D)(4)(d); *Hartt* at 6 (The jury's findings of fact are not subject to attack or review, thereby limiting the trial court's review to legal errors.).

---

[3] Effective July 1, 2020, Civ.R. 53(C) was amended by adding a new Division (C)(2) and renumbering the prior Division (C)(2) as Division (C)(3). 2020 Staff Note, Civ.R. 53(C)(2). New Division (C)(2) reflects changes to "the procedure following jury trials conducted by magistrates upon unanimous consent of the parties" and the trial court's role in entering judgment. *Id*. This amendment took effect after the trial court's judgment entry dated November 1, 2019. Accordingly, new Division (C)(2) is not applicable in this matter, and we will reference the previous version of Civ.R. 53 in effect at the time of the trial court's judgment entry.

{¶43} If no timely objections are filed to the magistrate's decision, "the court may adopt a magistrate's decision, unless it determines that there is an error of law or other defect evident on the face of the magistrate's decision." Civ.R. 53(D)(4)(c). The "evident on the face" standard contained in Civ.R. 53(D)(4)(c) does not require the trial court to engage in an independent review of the magistrate's decision. 2006 Staff Note, Civ.R. 53(D)(4)(c). *See Lowery v. Keystone Bd. of Educ.*, 9th Dist. Lorain No. 99CA007407, 2001 WL 490017, *2 (May 9, 2001), fn. 1, quoting former Civ.R. 53(E)(4)(a)[4] and *Miele v. Ribovich*, 90 Ohio St.3d 439, 443 (2000) (recognizing that the Ohio Supreme Court had held that former Civ.R. 53(E)(4)(a) did not require an independent review when there was no objection nor an erroneous magistrate's decision.).

{¶44} Civ.R. 53(D)(4)(c), however, is not the only procedure available to a trial court when there are no timely objections filed and there is no error of law or other defect evident on the face of the magistrate's decision. *See Yantek v. Coach Builders Ltd., Inc.*, 1st Dist. Hamilton No. C-060601, 2007-Ohio-5126, ¶ 11; 2006 Staff Note, Civ.R. 53(D)(4)(c). Civ.R. 53(D)(4)(b) provides the trial court with an alternative: "*Whether or not objections are timely filed*, a court may adopt or reject a magistrate's decision in whole or in part, with or without modification. A court may hear a previously-referred matter, take additional evidence, or return a matter to a magistrate." (Emphasis added.)

---

[4] Effective July 1, 2006, former Civ.R. 53(E)(4)(a) (effective July 1, 1995) was divided and renumbered as Civ.R. 53(D)(4)(a) and (c). The first sentence of former Civ.R. 53(E)(4)(a) was renumbered to Civ.R. 53(D)(4)(a), while the second sentence of former Civ.R. 53(E)(4)(a) was renumbered to Civ.R.(D)(4)(c) and modified to specify that the trial court's obligation is limited to review for errors of law evident on the face of the magistrate's decision. *See* 2006 Staff Note, Civ.R. 53(D)(4)(a), (c). The 2006 amendment to Civ.R. 53(D)(4)(c) remains in effect as of the July 1, 2020 amendment.

{¶45} Civ.R. 53(D)(4)(b) encompasses both a limited review for errors evident on the face of the magistrate's decision and an independent review. *See State ex rel. Russell v. Ohio Dept. of Rehab. and Corr.*, 10th Dist. Franklin No. 17AP-240, 2019-Ohio-4947, ¶ 5. The trial court has the right to independently review a magistrate's decision even if no timely objections are filed. *See Bailey v. Marrero-Bailey*, 7th Dist. Belmont No. 10 BE 16, 2012-Ohio-894, ¶ 19, quoting Civ.R. 53(D)(4)(b); *Hart v. Spenceley*, 12th Dist. Butler No. CA2011-08-165, 2013-Ohio-653, ¶ 14-15. *See generally Lakota v. Lakota*, 9th Dist. Medina No. 10CA0122-M, 2012-Ohio-2555, ¶ 14, citing Civ.R. 53(D)(4)(b). (This Court, citing Civ.R. 53(D)(4)(b) as an example, recognized that "Civ.R. 53 contemplates that a trial court may, within its discretion conduct a review that *exceeds* that specifically required."). (Emphasis in original.)

## Plain Error

{¶46} In this matter, the trial court rejected and vacated the punitive damages award in the magistrate's decision based on two instances of what it deemed to be plain error:[5] 1) the magistrate erred in charging the jury on punitive damages in the absence of evidence that "[Ms.] Shalodi engaged in malicious or aggravated or egregious conduct," and 2) the magistrate erred by allowing this matter to proceed to a jury trial where Ms. Shalodi was not present and no defense was presented on her behalf. Ms. Gibbons argues that the trial court erred in both of these determinations. We agree.

---

[5] We note that plain error is reserved for appellate review. *See State v. Morgan*, 153 Ohio St.3d 196, 2017-Ohio-7565, ¶ 1, 35-36, 39-41, quoting *State v. Wolery*, 46 Ohio St.2d 316, 326 (1976), *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002), and *Goldfuss v. Davidson*, 79 Ohio St.3d 116 (1997), syllabus (recognizing Ohio appellate courts applying plain error in criminal and civil appeals). Accordingly, we will construe the trial court's plain error review of the magistrate's decision as being a review for error in the magistrate's decision.

**Compliance with Civ.R. 53(D)(4)(c)**

{¶47}  As an initial matter, Ms. Gibbons argues that the trial court did not comply with Civ.R. 53(D)(4)(c) when it reviewed the magistrate's decision for error.  "[W]hether the trial court correctly applied the law to the facts of a case presents a question of law, which we review de novo."  *Fuline*, 2012-Ohio-2749, at ¶ 6.

{¶48}  Relying upon Civ.R. 53(D)(4)(c), Ms. Gibbons asserts that the trial court's review for error was limited to the face of the magistrate's decision and the trial court erred when it considered the trial testimony to support its determination.  We disagree.

{¶49}  Ms. Gibbons' argument fails to recognize that a trial court may proceed under Civ.R. 53(D)(4)(c) or Civ.R. 53(D)(4)(b) when there are no timely objections filed and there is no error of law or other defect evident on the face of the magistrate's decision.  *See* 2006 Staff Note, Civ.R. 53(D)(4)(c).  *See also Yantek*, 2007-Ohio-5126, at ¶ 11.  Additionally, Ms. Gibbons' argument ignores that when there are no timely objections and the trial court proceeds under Civ.R. 53(D)(4)(b), the trial court may either review the face of the magistrate's decision or conduct an independent review of the record.  *See Hart*, 2013-Ohio-653, at ¶ 14.  Accordingly, the trial court was not limited to proceeding under Civ.R. 53(D)(4)(c) and its review of the trial transcript was permitted under Civ.R. 53(D)(4)(b).

**Punitive Damages**

{¶50}  Ms. Gibbons argues that the trial court erred in finding error relative to charging the jury on punitive damages for two reasons:  the trial court "misinterpret[ed] the standard required to support a punitive damages award" and there was sufficient evidence regarding punitive damages presented at trial to warrant a jury instruction for punitive damages.  "[W]hether the trial court correctly applied the law to the facts of a case presents a question of law, which we

review de novo." *Fuline*, 2012-Ohio-2749, at ¶ 6. Additionally, this Court reviews de novo whether a jury instruction is factually warranted. *Cromer v. Children's Hosp. Med. Ctr. of Akron*, 142 Ohio St.3d 257, 2015-Ohio-229, ¶ 22, citing *Estate of Hall v. Akron Gen. Med. Ctr.*, 125 Ohio St.3d 300, 2010-Ohio-1041, ¶ 26.

{¶51} Generally, a requested jury instruction should be given if it is a correct statement of the law as applied to the facts in a given case. *Murphy v. Carrollton Mfg. Co.*, 61 Ohio St.3d 585, 591 (1991). A court's instructions to the jury should be limited to the actual issues raised by the evidence and in the pleadings. *Cromer* at ¶ 33. If there is no evidence to support an issue, then the trial court should not charge the jury on the issue. *Murphy* at 591, citing *Riley v. Cincinnati*, 46 Ohio St.2d 287 (1976), paragraph two of the syllabus. "'In reviewing a record to ascertain the presence of sufficient evidence to support the giving of a[n] * * * instruction, an appellate court should determine whether the record contains evidence from which reasonable minds might reach the conclusion sought by the instruction.'" (Alterations sic.) *Murphy* at 591, quoting *Feterle v. Huettner*, 28 Ohio St.2d 54 (1971), syllabus. This is the same test applied by the trial court when deciding a motion for directed verdict. *Feterle* at 55-56.

{¶52} In Ohio, punitive damages may be awarded in tort actions involving fraud, malice, or insult. *Preston v. Murty*, 32 Ohio St.3d 334, 334 (1987). *See* R.C. 2315.21(C)(1) (requiring that the "actions or omissions of [the] defendant demonstrate malice or aggravated or egregious fraud" to recover punitive damages). In this case, there is no allegation of fraud or insult. Therefore, a punitive damages award in this case must be based on malice.

{¶53} In *Preston*, the Ohio Supreme Court held that actual malice, a requisite component for a claim of punitive damages, is "(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights

and safety of other persons that has a great probability of causing substantial harm." (Emphasis omitted.) *Id*. at syllabus. Ms. Gibbons has based her claim for punitive damages on the second standard of conscious disregard.

{¶54} *Preston* specifically addressed the second standard for actual malice by setting forth what is required to establish a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm. *Id.* at 335. It did so because the "[c]ourts, including this court, have used diverse language to define and describe behavior that constitutes actual malice[]" and this type of malice was "frustratingly vague." *Id.*

{¶55} In conjunction with the various definitions of malice, *Preston* also considered the two policy reasons for awarding punitive damages: 1) to punish the defendant, and 2) to deter others from similar conduct. *Id.* at 335. *Preston* concluded that because punitive damages serve to punish the defendant and not to compensate the plaintiff, there must be "a positive element of conscious wrongdoing." *Id.* "This element has been termed conscious, deliberate or intentional. It requires the party to possess knowledge of the harm that might be caused by his behavior." *Id.*

{¶56} In addition to defining the requisite mental state, *Preston* also held that misconduct greater than mere negligence is required. *Id.* at 335. "This concept is reflected in the use of such terms as 'outrageous,' 'flagrant,' and 'criminal.'" *Id.* at 335-336. There must be a "finding that the probability of harm occurring is great and that the harm will be substantial." *Id.* at 336. A possibility or probability of harm occurring is merely negligence, which does not give rise to malice. *Id.*

{¶57} Five years later in *Motorists Mut. Ins. Co. v. Said*, 63 Ohio St.3d 690 (1992), the Ohio Supreme Court discussed its decision in *Preston* regarding actual malice and recklessness. *Id.* at 696-698, *overruled in part on other grounds by Zoppo v. Homestead Ins. Co.*, 71 Ohio St.3d

552 (1994), paragraph one of the syllabus. This discussion was in response to another Ohio Supreme Court decision, *Staff Builders, Inc. v. Armstrong*, 37 Ohio St.3d 298 (1988), that had "mistakenly described actual malice as including reckless behavior" and "inadvertently thrust the recklessness standard into the realm of punitive damages, thereby ignoring the established syllabus law in *Preston*." *Motorists* at 697.

{¶58} *Motorists* explained that in *Preston*, the Ohio Supreme Court had reviewed case law that "imprecisely defined 'actual malice' to include 'extremely reckless behavior revealing a conscious disregard for a great and obvious harm'" and ultimately "reject[ed] any definition of 'actual malice' which included recklessness as an element." *Motorists* at 696-697, quoting *Preston* at 335. Additionally, *Motorists* provided further explanation as to the mental state necessary for actual malice under the second standard set forth in the syllabus of *Preston*:

> *Preston* observed that actual malice requires consciousness of the near certainty (or otherwise stated "great probability") that substantial harm will be caused by the tortious behavior. Any less callous mental state is insufficient to incur that level of societal outrage necessary to justify an award of punitive damages. Therefore, it is evident that a reckless actor, who only has knowledge of the mere possibility that his or her actions may result in substantial harm, is not behaving maliciously.

*Motorists* at 698, citing Prosser & Keeton, *The Law of Torts*, Section 34, 212-214 (5th Ed.1984).

{¶59} *Motorists* recognized that other cases decided by the Ohio Supreme Court subsequent to *Preston* had correctly followed the syllabus of *Preston* and "refrain[ed] from allowing punitive damages to be assessed on mere reckless behavior." *Id*. at 697. Similarly, Ohio appellate courts have also recognized that malice does not include reckless conduct. *See, e.g., Spalding v. Coulson*, 8th Dist. Cuyahoga Nos. 70524, 70538, 1998 WL 564054, *16 (Sept. 3, 1998) (recognizing that recklessness does not "justify the imposition of punitive damages"); *Fox v. Williams*, 4th Dist. Lawrence No. 95 CA 38, 1996 WL 292046, *5 (May 28, 1996) (recognizing that "malice cannot include mere reckless conduct"); *Ferritto v. Olde & Co., Inc.*, 62 Ohio App.3d

582, 590 (8th Dist.1989) (recognizing that *Preston* required a finding of conscious disregard, which is a greater showing of intent than the "'reckless disregard' standard"). *See generally Dotson v. Village Res. Dev. Co.*, 9th Dist. Lorain No. 98CA007066, 1999 WL 494068, *5 (July 14, 1999) (recognizing that an element of recklessness contained in a statute was not a "positive element of conscious wrongdoing" in support of punitive damages).

{¶60} Additionally, the appellate courts in Ohio have quoted and relied upon the paragraph in *Motorists* further explaining the necessary mental state under the second standard for actual malice. *See, e.g., Oxford Mining Co., LLC v. Ohio Gathering Co., LLC*, 7th Dist. Belmont No. 19 BE 0016, 2020-Ohio-1363, ¶ 89; *Newport Harbor Assn. v. DiCello*, 8th Dist. Cuyahoga No. 87126, 2006-Ohio-4493, ¶ 19; *Estate of Schmidt v. Derenia*, 158 Ohio App.3d 738, 2004-Ohio-5431, ¶ 11 (10th Dist.); *Gollihue v. Consol. Rail Corp.*, 120 Ohio App.3d 378, 401 (3d Dist.1997); *Johnson v. Thrift S. & L. Co.*, 1st Dist. Hamilton No. C-920115, 1993 WL 323380, *3 (May 26, 1993); *Edmondson v. Steelman*, 87 Ohio App.3d 455, 459-460 (12th Dist.1992). The syllabus in *Preston* setting forth the standards for actual malice continues to be the law applied in Ohio.

{¶61} In reaching its decision that there was error in charging the jury on punitive damages, the trial court stated that the evidence established that Ms. Shalodi "acted selfishly, negligently, and recklessly, but not purposefully, intentionally, or maliciously." (Emphasis deleted.) The trial court focused on the lack of evidence of intentional conduct. Ms. Gibbons argues that reckless acts are evidence of punitive damages and because the trial court conceded in its judgment entry that Ms. Shalodi acted recklessly, there was no error in charging the jury regarding punitive damages.

{¶62} Neither the trial court nor Ms. Gibbons acknowledged the standard for actual malice set forth in *Preston*. Based upon *Preston*, the trial court's position is not entirely accurate. As noted above, Ms. Gibbons is seeking punitive damages based upon the second standard for actual malice: a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm. This requires "a positive element of conscious wrongdoing" which has been "termed [as] conscious, deliberate or intentional." *Preston*, 32 Ohio St.3d at 335. While the trial court was correct in its examination for intentional acts, it erred by not considering if there was evidence of wrongdoing that was deliberate or conscious. The error, however, was harmless, because the trial court found that the evidence indicated that Ms. Shalodi "acted selfishly, negligently, and recklessly," and such wrongdoing would not give rise to actual malice under the standard set forth in *Preston*. *See id*. Accordingly, the trial court's examination of the evidence for only intentional wrongdoing did not affect the substantial rights of Ms. Gibbons, and we will disregard this error in the proceedings. *See* Civ.R. 61.

{¶63} Ms. Gibbons relies upon *Whetstone v. Binner*, 146 Ohio St.3d 395, 2016-Ohio-1006, to support her position that reckless acts can be used in support of punitive damages. *Whetstone* states "Ohio law is well settled that punitive damages are available for personal injury or property loss caused by malice or ""'intentional, reckless, wanton, willful and gross acts.'"" *Id*. at ¶ 16, quoting *Rubeck v. Huffman*, 54 Ohio St.2d 20, 23 (1978), quoting *Columbus Fin., Inc. v. Howard*, 42 Ohio St.2d 178, 184 (1975), quoting the appellants' brief in *Columbus Fin., Inc.* Ms. Gibbons' reliance upon *Whetstone* is misplaced.

{¶64} This statement of law in *Whetstone* regarding punitive damages is dicta. The issue addressed by the Ohio Supreme Court in *Whetstone* was "whether punitive damages can be awarded against the estate of a deceased tortfeasor." *Id*. at ¶ 1. In *Whetstone*, a default judgment

had been entered against the defendant and malice was deemed admitted. *Id*. at ¶ 21. *Whetstone* did not address the question of whether reckless conduct was sufficient evidence to submit the issue of punitive damages to the jury.

{¶65} Additionally, the validity of this legal proposition is called into doubt because in *Whetstone* the Ohio Supreme Court quoted *Rubeck* and *Columbus*, both of which predated *Preston*. Accordingly, we reject Ms. Gibbons' argument regarding the use of reckless conduct to support an award of punitive damages.[6]

{¶66} Ms. Gibbons also argues that there was sufficient evidence at trial to support a punitive damages instruction being submitted to the jury. In order to submit the issue of punitive damages to the jury, the trial court must review the evidence and determine if reasonable minds can differ as to whether the "party consciously disregarded the injured party's rights or safety" and "whether the party was aware his or her act had a great probability of causing substantial harm." *Preston*, 32 Ohio St.3d at 336. Additionally, the plaintiff must prove his or her entitlement to punitive damages by clear and convincing evidence. *Wiegand v. Fabrizi Trucking & Paving Co., Inc.*, 9th Dist. Medina No. 16CA0015-M, 2017-Ohio-363, ¶ 46, quoting *Whetstone* at ¶ 20. *See* R.C. 2315.21(D)(4). "Clear and convincing evidence is that measure of degree of proof * * * which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

---

[6] Notwithstanding Ms. Gibbons' improper argument herein regarding reckless conduct, and her reliance upon reckless conduct in her complaint and at trial, we will proceed to review the trial transcript and exhibits under the second standard for actual malice set forth in *Preston*. *See generally Malone v. Courtyard by Marriott L.P.*, 74 Ohio St.3d 440, 446-447 (1996) (applying the second *Preston* standard despite the plaintiffs' arguments based upon recklessness).

{¶67} Detective Denman testified that he was assigned as the lead investigator in the death of N.G. He interviewed Ms. Shalodi, Ms. Gibbons, and a male friend of Ms. Shalodi, collected evidence from her townhouse, had tests performed on various items taken into evidence, met with the coroner, obtained results from drug tests of Ms. Shalodi and N.G., and obtained surveillance footage from various businesses.

{¶68} Ms. Shalodi indicated that N.G. was dropped off at her townhouse around 3:00 p.m. on December 12, 2015 and she was to babysit N.G. overnight. Ms. Gibbons confirmed this and provided Detective Denman with the text messages between herself and Ms. Shalodi regarding babysitting N.G. Originally Ms. Shalodi had plans and was unable to babysit, but then her plans changed and she agreed to babysit N.G.

{¶69} Receipts recovered from Ms. Shalodi's trash in her kitchen, along with surveillance footage, show Ms. Shalodi and N.G. shopping at a store at 5:24 p.m. on December 12, 2015. Ms. Shalodi told Detective Denman that she laid N.G. down for bed around 8:30 p.m. that evening. Surveillance footage and a receipt from a convenience store show that Ms. Shalodi was alone when she made a purchase at 8:49 p.m.

{¶70} Two movie stubs for a movie playing at 10:45 p.m. on December 12, 2015 were also recovered from Ms. Shalodi's kitchen trash. Surveillance footage shows Ms. Shalodi, alone, in the lobby of the movie theater purchasing the tickets at 10:55 p.m. and purchasing popcorn at 10:56 p.m. Detective Denman testified that Ms. Shalodi left the movie theater at 12:47 a.m. on December 13, 2015 with a male acquaintance. Ms. Shalodi had asked the man to go to the movies with her.

{¶71} Ms. Shalodi and her male friend are then recorded on surveillance video entering a store at 1:13 a.m. on December 13, 2015. A receipt from the store and the surveillance video

shows Ms. Shalodi left the store at 2:12 a.m. on December 13, 2015. Based on surveillance footage from the theater and the store, Ms. Shalodi and her male friend arrived and left separately at both locations.

{¶72} During her interview with Detective Denman, Ms. Shalodi originally stated that she was home that evening and did not have any visitors. She indicated that she had checked on N.G. around midnight and removed a blanket from the child to prevent her from suffocating. She again checked on N.G. around 2:00 a.m. and discovered the child was not breathing and something was wrong. A few hours into the interview, Ms. Shalodi told Detective Denman that she might have gone to the store around midnight for approximately thirty minutes.

{¶73} While Detective Denman was able to establish that certain events occurred between Ms. Shalodi finding N.G. unresponsive around 2:00 a.m. and Ms. Shalodi calling 911 at 6:34 a.m., he was unable to establish the order in which those events occurred. At the townhouse, Detective Denman observed that N.G. had "a pretty severe cut to her lower lip." Additionally, when he sat in during a conversation between the coroner and Ms. Shalodi, he learned that N.G. had "a pretty severe burn on her back."

{¶74} Ms. Shalodi could not explain how or when the cut on N.G.'s lip had occurred. She did, however, say she placed a band-aid and tape on N.G.'s lip because it was bleeding. A band-aid and tape, wrapped in a paper towel, were recovered from a garbage bag located in the garage.

{¶75} Additionally, a onesie that had "a substantial amount of blood on it," a rag with blood stains and a cleaning agent, and a woman's white shirt with stains, were recovered from the same garbage bag in the garage. Ms. Shalodi indicated the onesie was hers, but she could not explain why there was blood on the onesie. Lab testing confirmed that the blood on the onesie belonged to N.G.

{¶76} Another investigator had discovered two wet spots on the carpet in Ms. Shalodi's bedroom that appeared to have been a recent attempt to clean something. Detective Denman asked Ms. Shalodi about the wet spots on the carpet. Ms. Shalodi admitted that she had cleaned the two spots. Ms. Shalodi did not know for sure how the first spot was soiled. She mentioned maybe she bled on the floor after having cut her leg in the shower. As for the second spot located next to the bed, Ms. Shalodi stated that was where N.G. was lying and had secreted when Ms. Shalodi attempted CPR. These portions of the carpet were cut and removed from the bedroom and sent for testing. The lab results indicated that both carpet samples contained blood from N.G. only. Additionally, other areas in the room were swabbed, along with the swipe of blood found on the wall in the stairwell. The lab results confirmed the blood in all of these locations belonged to N.G.

{¶77} Detective Denman testified that the stained shirt was collected as evidence, but he did not testify regarding any testing or lab results from the shirt. The surveillance photos from the theater and the store show Ms. Shalodi was wearing a white shirt.

{¶78} Regarding the burns, Ms. Shalodi initially stated that she gave N.G. a bath and maybe the water was a little too hot and caused a burn. Later during the interview, Ms. Shalodi stated that the burns probably happened when she "'was trying to get a sign of life from [N.G.].'" She explained that she put N.G. in the kitchen sink and ran the water for about ten minutes. Detective Denman testified that Ms. Shalodi changed the time to five minutes after she saw his reaction. Ms. Shalodi used the kitchen sink because the water in that part of the townhouse was hotter.

{¶79} Detective Denman testified that Ms. Gibbons also provided him with a text message that she had received from Ms. Shalodi at 4:19 a.m. on December 13, 2015 regarding "the bath

and [N.G.'s] skin exfoliating a bit." Ms. Gibbons tried calling Ms. Shalodi as soon as she saw the text that morning, but Ms. Shalodi did not answer.

{¶80} The investigation also revealed that all of the baby clothing and blankets where N.G. had been sleeping had been laundered, and were in the dryer. These articles were discovered because the dryer door was open. Ms. Shalodi admitted that she had washed these items.

{¶81} Ms. Shalodi told the coroner and Detective Denman that she had searched the internet looking for problems with baby deaths. The download from her phone showed that she began searching the internet at 6:04 a.m. on December 13, 2015 regarding the following topics: "baby death by shopping cart, can baby sleep so soundly you think they're dead, * * * four-month-old infant passes away, disturbing true stories of daycare death and murder, signs of death." At 6:34 a.m., Ms. Shalodi called 911.

{¶82} After calling 911, Ms. Shalodi did not call Ms. Gibbons to let her know that something was wrong with N.G. When Ms. Shalodi learned that Ms. Gibbons was on her way to the townhouse, she became concerned because she did not know how she was going to explain what happened. Because Ms. Shalodi did not want to be present when Ms. Gibbons arrived, Ms. Shalodi agreed to go to the police station for the remainder of the interview.

{¶83} Detective Denman learned that Ms. Shalodi had a master's degree in education, was a former teacher, and "knows a little bit about CPR." Ms. Shalodi claimed she did some CPR on N.G. Additionally, Ms. Shalodi told Detective Denman that her father is a physician, but she did not call him because he is not a pediatrician.

{¶84} Inside Ms. Shalodi's purse was a baggie with some pills and residue from pills being smashed. The baggie, pills, and residue were tested and identified as Xanax and Benzodiazepines. Drug tests were performed on both Ms. Shalodi and N.G. They both tested

positive for Xanax. Additionally, two empty prescription pill bottles were found in the kitchen trash. Based upon a pill count, one prescription was taken correctly, but the other prescription should have had pills remaining. Ms. Shalodi indicated that all of her pills were accounted for and she kept them in a container next to her bed stand and there was no way N.G. could have gotten into her pills. These pills and the container were not found during the search.

{¶85} Dr. Miller, the Lorain County Chief Deputy Coroner and an expert in forensic pathology, performed an autopsy on N.G. Dr. Miller indicated that N.G. was in full arrest when the paramedics arrived and her extremities were already cold. He was not able to determine the time of death. After conducting the autopsy, Dr. Miller concluded that N.G. died from the combined effects of head trauma and alprazolam intoxication.

{¶86} The autopsy revealed two primary external injuries. The first was bruising to both the upper and lower lip and two lacerations on the lower lip. The lacerations were full thickness perforations of the skin and lip. Based upon the bruising overlaying the lower teeth, Dr. Miller opined these injuries would have occurred from pressing N.G.'s lip against her teeth.

{¶87} The second external injury consisted of a second degree burn on N.G.'s upper left back that had blistered. This burn was two and a half inches by two and a half inches. Additionally, there were smaller burns, approximately a quarter to a half inch in size, randomly located on N.G.'s right shoulder and neck. Dr. Miller explained these smaller satellite burns are "a common thing to see when the source of [the] burn is water because there's some splashing and the hot splashes also can cause their own little burns."

{¶88} The autopsy also revealed a significant injury to the brain. Dr. Miller stated N.G. had sustained multiple subgaleal hemorrhages. Dr. Miller explained that this is bruising between the scalp and the brain. These hemorrhages were located on all sides of N.G.'s brain, but there

were no skull fractures. There was approximately 20 millimeters of blood from these hemorrhages causing a clot. Dr. Miller explained "that is not a very large amount * * * but this is not some trivial unimportant thing." The bleeding was located over multiple portions of the brain and was causing the brain to swell.

{¶89} Dr. Miller indicated that this injury is associated with blunt force trauma to the head. Dr. Miller opined that N.G.'s injuries were not likely a result from N.G. falling multiple times because the hemorrhages were located on all sides of the brain and the medical literature indicates that falls from a child's own height is not enough distance to result in this injury. Dr. Miller could not identify an instrument that could have caused the blunt force trauma because there was no pattern to the injury. Instead, the injury to the brain indicated that "the head struck something or something struck the head." Dr. Miller explained that "this could be a blow to the head or the head running into a wall or a piece of furniture, a door frame, something like that." He went on to say that "If the child is being moved around erratically, they can hit their head while a person is moving them around or throwing them around or shaking them." Further support of Dr. Miller's opinion that N.G. was being moved erratically was the bruising to N.G.'s back on the left and right sides and the lower lumbar region. This type of bruising is indicative of grasping a child's trunk or additional blows to the child.

{¶90} Dr. Miller opined that all of these injuries occurred while N.G. was alive. He explained that these injuries all involved bleeding and bruising which can only occur with the circulation of blood when a person is alive.

{¶91} Lastly, drug and chemical testing of N.G.'s blood and urine detected the presence of Xanax. Blood samples from N.G.'s stomach and from the blood clot in her head measured very high levels of the drug, which is indicative of the drug having entered the blood stream through

ingestion. The presence of the drug in N.G.'s urine established that the drug had been in her body long enough to metabolize. Dr. Miller explained that Xanax is not prescribed for children and the level of Xanax found in N.G.'s body was equivalent to the amount that would be seen in an adult taking the drug. Thus, this level of Xanax in a child is toxic and can cause drowsiness, heart rhythm problems, low blood pressure, seizures, and suppressed breathing.

{¶92} When proceeding on the conscious disregard definition of malice under *Preston,* a punitive damage claim requires proof of the defendant's subjective knowledge of the danger posed to another by his conduct. *Malone*, 74 Ohio St.3d 440, at syllabus. In determining whether a defendant's subjective mental state resulted in malicious conduct, courts must consider what the defendant "*did* do," just as much as courts consider what the defendant failed to do or could have done better. (Emphasis sic.) *See Estate of Schmidt*, 158 Ohio App.3d 738, 2004-Ohio-5431, at ¶ 25. Actual malice may be inferred from the conduct and surrounding circumstances. *See Davis v. Tunison*, 168 Ohio St. 471, 475 (1959).

{¶93} A defendant's actions *following* the act of negligence that are directly related to or a result of the defendant's negligence may be used to establish actual malice. *Cappara v. Schibley*, 85 Ohio St.3d 403, 407 (1999) (fleeing the scene and failing to disclose involvement in the automobile accident was evidence in support of punitive damages). *See also Moskovitz v. Mt. Sinai Med. Ctr.*, 69 Ohio St.3d 638, 651-653 (1994) (subsequent act of destroying medical records or falsifying medical records was related to and a consequence of the medical negligence and could be viewed as evidence of guilt in support of actual malice). "Punitive damages are not awarded for the incident of injury, but are awarded due to the aggravated circumstances apart from or surrounding the injury or the actions of the party causing the injury." *Troyer v. Horvath*, 13 Ohio App.3d 155, 157 (8th Dist.1983).

{¶94} Multiple actions taken by Ms. Shalodi in response to her negligence support a finding of actual malice. Prior to calling 911 Ms. Shalodi discarded multiple bloody items containing N.G.'s blood and placed the garbage in the garage, she cleaned N.G.'s blood stains on the carpet, she laundered all of N.G.'s clothing and blankets, and she went to the police station in order to avoid having to explain to Ms. Gibbons what had occurred. Evidence of Ms. Shalodi's subjective knowledge of the danger her conduct posed to N.G. includes her failure to contact Ms. Gibbons after finding N.G. unresponsive and being unable to revive N.G. and again after calling 911, waiting four hours to call 911, and searching baby deaths in the thirty minutes preceding the 911 call. Additional evidence of Ms. Shalodi's subjective mental state was her use of the kitchen sink to place N.G. in hot water to "'get a sign of life from [N.G.]'" because the water in the kitchen was hotter and then sending Ms. Gibbons a text two hours after finding N.G. unresponsive about a bath and some skin exfoliation on N.G.'s back. There was also evidence of aggravating factors surrounding N.G.'s injuries and death, such as Dr. Miller's testimony regarding how N.G. sustained blunt force trauma and the toxic levels of Xanax found in N.G.'s blood and urine due to ingesting the drug, along with Detective Denman's testimony regarding the baggie found in Ms. Shalodi's purse containing Xanax pills and residue from the pills being smashed.

{¶95} "*Preston* observed that actual malice requires consciousness of the near certainty (or otherwise stated 'great probability') that substantial harm will be caused by the tortious behavior." *Motorists*, 63 Ohio St.3d at 698. The foregoing evidence supports a finding that Ms. Shalodi acted with a "positive element of conscious wrongdoing" through her conscious and deliberate acts and the "probability of harm occurring [was] great and that the harm [would] be substantial." *See Preston*, 32 Ohio St.3d at 335-336. Moreover, the evidence in this matter shows

Ms. Shalodi possessed a "callous mental state" sufficient "to incur that level of societal outrage necessary to justify an award of punitive damages." *See Motorists* at 698.

**{¶96}** Based upon the foregoing, we conclude that there is sufficient clear and convincing evidence from which reasonable minds might reach the conclusion that Ms. Shalodi acted with a conscious disregard for the rights and safety of N.G. in a way that had a great probability of causing substantial harm to N.G. Accordingly, there is sufficient evidence of actual malice under the second standard of the *Preston* test to support giving a jury instruction on the issue of punitive damages. Had there been no evidence in the trial transcript and exhibits from which actual malice could have been inferred, then the punitive damages charge would have been prejudicially erroneous. *See Davis*, 168 Ohio St. at 476.

**{¶97}** In light of the foregoing, we conclude that the trial court erred in its determinations that there was no evidence presented at trial that Ms. Shalodi engaged in malicious conduct and that it was error for the magistrate to charge the jury with punitive damages in this matter. Accordingly, the trial court erred when it rejected in part the magistrate's decision and vacated the punitive damages award based upon those reasons.

**Undefended Jury Trial**

**{¶98}** Ms. Gibbons argues that there was no legal basis for the trial court's finding that there was error based upon Ms. Shalodi's lack of defense at trial. "[W]hether the trial court correctly applied the law to the facts of a case presents a question of law, which we review de novo." *Fuline*, 2012-Ohio-2749, at ¶ 6.

**{¶99}** The trial court found there was error related to the $35,250,000 punitive damages award because of the manner in which this case proceeded: a civil jury trial wherein Ms. Shalodi

was not present and no defense was presented on her behalf.[7] The trial court suggests that the punitive damages award would have been "substantially mitigated" had there been evidence, argument, or facts presented to the jury on Ms. Shalodi's behalf. The trial court focused on the fact that this was an "undefended" trial. In doing so, the trial court failed to acknowledge the events preceding the jury trial that led to the trial being "undefended" and the effect of Ms. Gibbons' jury demand.

{¶100} The day after the final pretrial, Ms. Shalodi's counsel filed a motion to withdraw as counsel. The motion indicated that following the final pretrial with the trial court, Ms. Shalodi and her family after having been "fully informed of the possible adverse effects as a result of the withdrawal, instructed and consented to the filing of [the] motion."

{¶101} Thereafter, the trial court had Ms. Shalodi transported from prison to the Lorain County courthouse. Four days prior to the jury trial, Ms. Shalodi appeared, in person, before the magistrate for a hearing regarding the motion to withdraw as counsel. At the hearing, Ms. Shalodi "consented to her attorneys withdrawing from the case" and "after being advised of her rights in this case, [Ms. Shalodi] freely and voluntarily chose not to participate, in any way, in the jury trial[.]"

{¶102} The magistrate's decision following the jury trial reiterated that Ms. Shalodi had appeared in open court four days prior to the jury trial and consented to the withdrawal of her defense counsel. Additionally, Ms. Shalodi "acknowledged, in open court, that she would not offer any defense in the jury trial in this civil action."

---

[7] While the trial court took issue with the procedural course in this matter, it only found error as to the punitive damages. The trial court did not find the compensatory damages in this "undefended" jury trial to be error.

{¶103} There is nothing in the record to suggest that Ms. Shalodi was denied the right to present a defense at trial, either through counsel or pro se. Rather, she made the decision to terminate her counsel and to not participate in the jury trial. Moreover, Ms. Shalodi made these decisions after having consulted with her counsel and upon inquiry from the magistrate in open court. Accordingly, the record reflects that Ms. Shalodi made an informed decision to not present a defense at the jury trial and that the magistrate went to great lengths to afford Ms. Shalodi the opportunity to be represented by counsel, or to otherwise participate in the jury trial. Thus, the record reflects that the trial was "undefended" because of Ms. Shalodi's choice and not because of an error by the magistrate.

{¶104} With regard to this matter proceeding to a jury trial, the trial court failed to recognize Ms. Gibbons' right to a jury in this matter. The right to a jury trial is a "substantive fundamental constitutional right." *Soler v. Evans, St. Clair & Kelsey*, 94 Ohio St.3d 432, 437 (2002). Civ.R. 38(B) provides in part, "Any party may demand a trial by jury on any issue triable of right by a jury by serving upon the other parties a demand therefor at any time after the commencement of the action and not later than fourteen days after the service of the last pleading directed to such issue." The jury demand may specify the issues to be tried to the jury or it may be general and apply to all issues triable by the jury. Civ.R. 38(C). Once a party has demanded a jury trial, the demand can only be withdrawn with the consent of all the parties. *See* Civ.R. 38(D). This Court has recognized that "Ohio case law is clear that once any party makes a proper jury demand, the demand applies to the entire action and all parties, regardless of which party made the demand, and can be waived only as provided by Civ.R. 39(A)." *Jovanovski v. Kotefski*, 9th Dist. Lorain Nos. 07CA009203, 07CA009223, 2008-Ohio-4773, ¶ 14. *See West v. Scott*, 7th Dist.

Mahoning No. 01 CA 24, 2001 WL 1568880, * 2 (Dec. 6, 2001) ("[I]f one party demands a jury trial, all other parties in the same action must also have the matter tried by a jury.").

{¶105} Civ.R. 39(A) sets forth three ways by which a jury trial may be waived after a proper demand has been made: 1) the parties may stipulate to a bench trial by either an oral stipulation made on the record in open court or a written stipulation filed with the court; 2) the trial court, upon motion or sua sponte, may find that the right to a jury trial does not exist; or 3) the party or his attorney fails to answer or appear for trial. The 1971 Staff Note for Civ.R. 39 explains that the last waiver method permits a plaintiff who demands a jury trial to withdraw the demand without the consent of all the parties and to proceed without a jury when the defendant or his counsel has failed to answer or appear for trial. *See, e.g., Huffer v. Cicero*, 107 Ohio App.3d 65, 71-72 (4th Dist.1995).

{¶106} In this matter, Ms. Gibbons made a timely general jury demand in her complaint. Ms. Gibbons' proper jury demand applied to the entire action. Ms. Shalodi's failure to appear for trial was a waiver of her right to a jury trial under Civ.R. 39(A), but not Ms. Gibbons' right to a jury trial. Furthermore, Ms. Gibbons did not move to withdraw her jury demand in light of the advance notice that Ms. Shalodi would not appear at trial. Nor does the record reflect any other waivers as permitted under Civ.R. 39(A). Ms. Gibbons' claims for survivorship and wrongful death, along with the resulting damages, including punitive damages, were all issues triable to a jury.

{¶107} Based upon the record, there was a proper jury demand under Civ.R. 38 that applied to Ms. Gibbons and Ms. Shalodi as to the triable issues in the complaint, and there was no effective waiver of the right to a trial by jury under Civ.R. 39(A). Accordingly, Ms. Gibbons' complaint

was properly designated as being a jury action and was required to proceed to a jury trial on all triable issues. We cannot conclude that it was error to allow this matter to proceed to a jury trial.

{¶108} Accordingly, we conclude that the trial court erred when it rejected in part the magistrate's decision and vacated the punitive damages award on the basis that the matter proceeded to a jury trial where Ms. Shalodi chose not to defend herself.

## Equity

{¶109} The trial court also invoked its equity jurisdiction and applied the principles of equity to reject in part the magistrate's decision and vacate the jury's award for punitive damages. Ms. Gibbons argues that the principles of equity do not apply to this case. As stated above, we generally review a trial court's decision with respect to a magistrate's decision for an abuse of discretion. *Barlow*, 2009-Ohio-3788, at ¶ 5. However, the issue before this Court is whether the trial court correctly applied the law to the facts in this case. *See Fuline*, 2012-Ohio-2749, at ¶ 6. This is a question of law which we review de novo. *Id.*

{¶110} The trial court's actions stem from its belief that the punitive damages award was unfair and unreasonable in this matter because Ms. Shalodi did not present a defense, she has taken responsibility for her actions in the criminal case and is serving 22 years in prison, and Ms. Gibbons does not think that Ms. Shalodi acted intentionally. The trial court posited that its equity jurisdiction granted it the authority to correct this injustice as it "endeavors to do justice for all who come before it." (Emphasis deleted.) The trial court has misconstrued the application of the principles of equity.

{¶111} "'To bring a cause within the jurisdiction of a court of equity, it is requisite that the primary right involved be an equitable right as distinguished from a legal right, or that the remedy at law as to the right involved is not full, adequate and complete.'" *Bd. of Edn. of the N. Olmsted*

*City School Dist. v. Bd. of Edn. of the Cleveland Mun. School Dist.*, 108 Ohio St.3d 479, 2006-Ohio-1504, ¶ 51 (Lundberg Stratton, J., dissenting), quoting *State ex rel. Lien v. House*, 144 Ohio St. 238, 244 (1944), citing 30 Corpus Juris Secundum, Equity, Section 20, at 338. Accordingly, it is error for a trial court to apply principles of equity when there has been no request for equitable relief and there is an adequate remedy at law. *See Reno v. Clark*, 33 Ohio App.3d 41, 43 (3d Dist.1986)

{¶112} In this matter, Ms. Gibbons, as the administrator of the estate of N.G., pled causes of action for survivorship and wrongful death based upon Ms. Shalodi's negligence, which resulted in injury to and the death of N.G. *See Thompson v. Wing*, 70 Ohio St.3d 176, 179 (1994). Survivorship and wrongful death actions premised upon negligence are torts. *See Goodwin v. Facebook, Inc.*, 8th Dist. Cuyahoga No. 109203, 2020-Ohio-4834, ¶ 15-16. There were no equitable claims or equitable defenses asserted in this matter. Accordingly, the trial court's equity jurisdiction was not invoked.

{¶113} Additionally, Ms. Gibbons sought compensatory and punitive damages for the survivorship action and compensatory damages for the wrongful death action. When the ultimate relief sought is a money judgment, a "court of equity will not ordinarily take jurisdiction[.]" *House* at 244, citing *Weidman v. Weidman*, 274 Mass. 118, 121-122 (1931).

{¶114} A survivorship action is provided for by statute and provides recovery of compensatory and punitive damages for "the injuries suffered by the decedent before his death" or injuries to the property of the deceased. *See Peters v. Columbus Steel Castings Co.*, 115 Ohio St.3d 134, 2007-Ohio-4787, ¶ 10; R.C. 2305.21; *Estate of Beavers v. Knapp*, 175 Ohio App.3d 758, 2008-Ohio-2023, ¶ 16, 18, 20. Similarly, a wrongful death action is purely a statutory action that provides damages to the surviving beneficiaries defined in the statute and it "is the only civil

remedy available to compensate surviving beneficiaries." *Griffiths v. Doctors Hosp.*, 150 Ohio App.3d 234, 2002-Ohio-6173, ¶ 14 (5th Dist.). *See* R.C. 2125.01; R.C. 2125.02(A)(1). R.C. 2125.02 provides only for the recovery of damages and specifically identifies the various types of compensatory damages that may be awarded to the decedent's next of kin. *See* R.C. 2125.02(A) and (B). Because Ms. Gibbons sought monetary damages and those are the only damages provided for by law for survivorship and wrongful death actions, Ms. Gibbons had an adequate remedy at law for the survivorship action and the wrongful death action, and the trial court's equity jurisdiction was not invoked.

{¶115} The trial court did not consider whether there were equitable claims or if there was an adequate legal remedy when it invoked its equity jurisdiction. Rather, the trial court improperly relied upon subjective principles of equity and fundamental fairness to invoke its equity jurisdiction. Based upon the foregoing, the trial court erred when it invoked its equity jurisdiction to reject in part the magistrate's decision and vacate the punitive damages award. *See Reno*, 33 Ohio App.3d at 43.

### Caps on Punitive Damages and Remittitur

{¶116} Lastly, Ms. Gibbons argues that the trial court did not have authority to sua sponte strike the punitive damages award because the caps on punitive damages is an affirmative defense and a trial court cannot raise an affirmative defense sua sponte. Additionally, Ms. Gibbons suggests that the trial court's judgment vacating the punitive damages award was an improper remittitur and the trial court did not have the authority to reduce the verdict without her consent. Ms. Gibbons' reliance upon these legal principles is not applicable in this matter because the trial court did not base its decision on statutory damages caps or remittitur. Accordingly, Ms. Gibbons' arguments regarding damages caps and remittitur are not well-taken.

{¶117} Ms. Gibbons' second assignment of error is sustained.

III.

{¶118} Ms. Gibbons' first assignment of error is overruled and her second assignment of error is sustained. The judgment of the Lorain County Common Pleas Court is affirmed in part, reversed in part, and the matter is remanded to the trial court for further proceedings consistent with this opinion.

Judgment affirmed in part,
reversed in part,
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed equally to Appellant and Appellee Summer Shalodi.

LYNNE S. CALLAHAN
FOR THE COURT

HENSAL, J.
TEODOSIO, J.
<u>CONCUR.</u>

<u>APPEARANCES:</u>

DENNIS R. LANSDOWNE, Attorney at Law, for Appellant.

CARI FUSCO EVANS, Attorney at Law, for Appellee.